# STATE OF CONNECTICUT *v.* GEORGE MICHAEL LENIART
## (SC 19809)
## (SC 19811)

Palmer, McDonald, Robinson, D'Auria, Mullins, Kahn and Vertefeuille, Js.*

*Syllabus*

The defendant, who was convicted of capital felony and murder following the disappearance of the victim, appealed from the judgment of conviction, claiming, inter alia, that certain evidentiary rulings substantially affected the jury's verdict and that there was insufficient evidence to sustain his conviction under the common-law corpus delicti rule. At trial, the state presented testimony from A, who had been serving a ten year sentence for a sexual assault involving another victim at the time of the defendant's trial. A testified that he and the defendant had sexually assaulted the victim, a fifteen year old girl, after the three had driven to a secluded wooded location in the defendant's truck. A testified that he last saw the victim in the defendant's truck and that, when he met the defendant the following day, the defendant, who was a lobster fisherman, had confessed to killing the victim, placing her remains in a lobster trap, and dropping the trap into a river. In order to impeach A's credibility,

_____

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

State *v.* Leniart

the defendant sought to admit a video recording depicting a police officer interviewing A prior to the administration of a polygraph examination. The defendant claimed that the video was relevant because it showed that A had been promised favorable treatment in exchange for his cooperation. The trial court, however, excluded the video on the ground that it constituted inadmissible polygraph evidence under *State* v. *Porter* (241 Conn. 57). The state also presented testimony from three individuals who previously had been incarcerated with the defendant. The first of those witnesses, B, testified that the defendant had admitted to choking an intoxicated young girl to death while having sex with her, dismembering her body, and disposing of it in lobster pots in Long Island Sound. The second of those witnesses, D, testified that the defendant told him that the victim's body was in a river and had been eaten by crabs. A, B, and D all testified that they hoped to receive some consideration from the state in exchange for their testimony. The third of those witnesses, C, who was no longer incarcerated at the time of trial, testified that the defendant had admitted to raping and killing a fifteen year old girl on his boat and hiding the body in a well before ultimately dumping it in Long Island Sound. The state also elicited testimony at trial from a thirteen year old victim in a separate case indicating that, six months before the victim's disappearance, the defendant had choked her while raping her. Finally, the state called S, the defendant's ex-wife, who testified that she had asked the defendant whether he was involved in the victim's disappearance and that the defendant had told her that, the less she knew, the better off she was. At trial, the defendant sought to introduce testimony from N, a law professor who had studied issues related to use of incarcerated informants as witnesses in criminal prosecutions. The state objected, and N testified, outside the presence of the jury, that, among other things, the use of such informants is a significant source of wrongful convictions and that inmates may gather information from gossip, other inmates' legal files, or the media in order to fabricate believable, incriminating stories in exchange for favorable treatment. Although N was able to testify about the use of such witnesses in certain other jurisdictions, she acknowledged that she had not studied customs or practices in Connecticut. The trial court ultimately excluded N's testimony, concluding that it invaded the exclusive province of the jury by assessing the credibility of the state's witnesses and that it did not convey any relevant information beyond the ken of the average juror. After closing arguments, the trial court instructed the jury regarding the credibility of criminal informants. On appeal, the defendant raised an unpreserved claim under the corpus delicti rule that the state had failed to set forth sufficient evidence at trial to corroborate his alleged confessions and to establish that the victim was, in fact, dead. The defendant also claimed that the trial court had improperly excluded the video recording and N's testimony. Although the Appellate Court rejected the defendant's sufficiency claim for lack of preservation, it agreed with

State *v.* Leniart

both of the defendant's evidentiary claims. Because the Appellate Court found that those evidentiary errors were harmful, it reversed the trial court's judgment and remanded the case for a new trial. Both the state and the defendant, on the granting of certification, appealed to this court. In his appeal, the defendant claimed that the Appellate Court improperly rejected his sufficiency claim under the corpus delicti rule. In its appeal, the state claimed that the Appellate Court incorrectly concluded that the trial court had improperly excluded the video recording and N's testimony. *Held*:

1. The defendant could not prevail on his unpreserved sufficiency claim under this state's common-law corpus delicti rule: the purpose, history, and scope of the corpus delicti rule, in this state as well as in other jurisdictions, supported this court's conclusion that the rule both bars the admissibility of evidence of uncorroborated confessions and imposes a substantive due process requirement, and, therefore, contrary to the Appellate Court's conclusion, the defendant's corpus delicti claim was reviewable on appeal even though it was not properly preserved at trial; moreover, although this court declined the defendant's invitation to specifically require the state to prove the fact of death by evidence independent of a defendant's confession in a murder case under the modern formulation of the corpus delicti rule, in light of circumstances surrounding the victim's disappearance, the testimony of A regarding the sexual assault of the victim and related events, the fact that the defendant had been convicted of sexually assaulting a thirteen year old girl in a separate case, S's testimony, and the similarities between the defendant's confessions as recounted by A, B, D, and C, this court concluded that there was sufficient, corroborating evidence, independent of the defendant's confessions, of the victim's death and of the credibility of those confessions for the jury to have found the defendant guilty beyond a reasonable doubt.

2. The Appellate Court incorrectly concluded that the trial court's improper exclusion of the video recording constituted harmful error: the trial court improperly excluded the video for all purposes under *Porter*, as that case defined inadmissible polygraph evidence to include only the results of a polygraph test and the willingness of a witness to undergo such a test, and, accordingly, *Porter* did not categorically preclude the admission of all evidence regarding the pretest interview process; nevertheless, the defendant failed to meet his burden of demonstrating that the exclusion of the video substantially affected the verdict because the polygrapher had repeatedly emphasized the importance of telling the truth while making only infrequent, potentially troubling remarks, A's own testimony on cross-examination by defense counsel provided strong evidence of the powerful incentives that he had to cooperate with the state by freely admitting his own participation in the underlying crimes and his desire for leniency in connection with the unrelated sexual assault conviction, and the state's case against the defendant was otherwise strong.

State *v.* Leniart

3. The Appellate Court incorrectly concluded that the trial court had abused
    its discretion in precluding N's testimony regarding the credibility of
    incarcerated informants; although the trial court incorrectly concluded
    that N's testimony would have invaded the exclusive province of the
    jury by assessing the credibility of witnesses, as N explicitly testified
    that she had no knowledge of this particular case and that she was not
    familiar with and did not intend to comment on the testimony of any
    particular witness, the trial court reasonably concluded that the relevant
    information presented through N's testimony was not beyond the ken
    of the average juror, as the trial court could have credited N's testimony
    that any fundamental concerns regarding the reliability of informant
    testimony have been exposed by the media and are well understood
    outside of the jailhouse, and as any concepts relating to the credibility
    of incarcerated informants that were directly and specifically applicable
    to this case would have been made familiar to the jury through com-
    mon sense, other information presented at trial, and the trial court's
    instructions.

*State* v. *Uretek, Inc.* (207 Conn. 706), to the extent that it suggested that
    corpus delicti claims do not implicate fundamental due process rights
    and, therefore, are not reviewable on appeal unless preserved at trial,
    overruled.

(*One justice concurring separately*; *three justices
concurring in part and dissenting in part
in two separate opinions*)

Argued May 2, 2018—officially released September 10, 2019

*Procedural History*

Substitute information charging the defendant with
three counts of the crime of capital felony and one
count of the crime of murder, brought to the Superior
Court in the judicial district of New London and tried
to the jury before *Jongbloed, J.*; thereafter, the court
granted the state's motion to preclude certain evidence;
verdict and judgment of guilty, from which the defen-
dant appealed; subsequently, the Appellate Court, *Shel-
don* and *Prescott, Js.*, with *Flynn, J.*, concurring in part
and dissenting in part, reversed the judgment of the
trial court and remanded the case for a new trial, and the
state and the defendant, on the granting of certification,
filed separate appeals with this court. *Reversed in part*;
*further proceedings*.

State *v.* Leniart

*Stephen M. Carney*, senior assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *John P. Gravalec-Pannone*, former senior assistant state's attorney, for the appellant in Docket No. SC 19809 and the appellee in Docket No. SC 19811 (state).

*Lauren Weisfeld*, chief of legal services, for the appellee in Docket No. SC 19809 and the appellant in Docket No. SC 19811 (defendant).

*Opinion*

MULLINS, J. Following a jury trial, the defendant, George Michael Leniart, was convicted of murder in violation of General Statutes § 53a-54a (a) and three counts of capital felony in violation of General Statutes (Rev. to 1995) § 53a-54b (5), (7), and (9), as amended by Public Acts 1995, No. 95-16, § 4.[1] The Appellate Court reversed the judgment of conviction and remanded the case for a new trial, holding that the trial court improperly excluded (1) a videotape that depicted a police officer interviewing a crucial prosecution witness prior to the administration of a polygraph examination, and (2) certain expert testimony proffered by the defendant regarding the reliability of jailhouse informant testimony. *State* v. *Leniart*, 166 Conn. App. 142, 146–47, 140 A.3d 1026 (2016). The Appellate Court also considered and rejected the defendant's claim regarding the sufficiency of the underlying evidence. Id. We granted both the state's and the defendant's petitions for certification to appeal.

In its certified appeal, the state challenges the conclusion of the Appellate Court that the videotape and expert testimony were improperly excluded. In his appeal, the defendant contends that he is entitled to a judgment of acquittal because, under the common-law

---

[1] For the sake of simplicity, we note that all references in this opinion to § 53a-54b are to General Statutes (Rev. to 1995) § 53a-54b, as amended by Public Acts 1995, No. 95-16, § 4.

State *v.* Leniart

corpus delicti rule, the state failed to set forth sufficient evidence, independent of the defendant's own admissions, to establish that the alleged victim was, in fact, dead.

We reverse the judgment of the Appellate Court with respect to the state's appeal and affirm the judgment with respect to the defendant's appeal. Specifically, we conclude that (1) although the defendant's corpus delicti claim is not merely evidentiary and, therefore, is reviewable on appeal, the Appellate Court correctly concluded that there was sufficient evidence to support the conviction, (2) although the Appellate Court correctly concluded that the trial court's exclusion of the videotape was improper, the exclusion of that evidence was harmless, and (3) the Appellate Court incorrectly concluded that the trial court had abused its discretion in precluding the expert testimony proffered by the defendant.

The following facts, which the jury reasonably could have found, and procedural history are relevant to the claims before us. On May 29, 1996, the victim,[2] who was then fifteen years old, snuck out of her parents' home to meet Patrick J. Allain, a teenage friend also known as P.J., so that they could smoke marijuana, drink alcohol, and have sex. The two teenagers were picked up by the defendant, who at the time was thirty-three years old. They then drove to a secluded, wooded location near the Mohegan-Pequot Bridge in the defendant's truck.

While parked, the victim and Allain kissed, drank beer, and smoked marijuana. At some point, the defendant, who had told Allain that he was in a cult, called Allain aside and told him that he wanted "to do" the victim and that he "wanted a body for the altar."

---

[2] In accordance with our policy of protecting the interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

State *v.* Leniart

Allain, who feared the defendant, returned to the truck and informed the victim that he and the defendant were going to rape her. Allain then removed her clothes and had sex with her in the truck while the defendant watched through the windshield. After Allain and the victim finished having sex, the defendant climbed into the truck and sexually assaulted the victim while Allain held her breast. After the assault, the victim pretended not to be upset so that the defendant would not harm her further.

The defendant then drove the teenagers back to Allain's neighborhood. The defendant dropped off Allain near his home, and the victim remained in the truck. The victim never returned home that night and was never seen again, despite a protracted nationwide search by law enforcement. The search also did not recover her body.

Allain subsequently implicated the defendant in the victim's death. As a result, in 2008, the state charged the defendant with murder in violation of § 53a-54a, capital felony in violation of § 53a-54b (5) for murder in the course of a kidnapping, capital felony in violation of § 53a-54b (7) for murder in the course of a sexual assault, and capital felony in violation of § 53a-54b (9) for murder of a person under the age of sixteen. The case was tried to a jury.

The state's case against the defendant included the testimony of four witnesses, who each testified that, at different times, the defendant had admitted, directly or indirectly, to killing the victim. Allain, the state's key witness, was serving a ten year sentence for an unrelated sexual assault at the time of trial. He testified that, on the afternoon following the previously described events, the defendant had asked to meet with him on a path behind the Mohegan School in Montville. At that meeting, the defendant admitted that "he had to do [the victim]—to get rid of her." The defendant described to Allain how, after dropping Allain off the night before,

State *v.* Leniart

he had pretended to run out of gas near the path.[3] He then ripped the license plates off his truck, dragged the frantic victim into the woods, and choked her. Later that evening, at a second meeting, the defendant further confessed to Allain that he had killed the victim and had "erased" her by placing her remains in a lobster trap and dropping them into the mud at the bottom of the Thames River. The defendant was a lobster fisherman at the time.

Like Allain, the state's three other confession witnesses either were inmates at the time of trial or previously had been incarcerated. Each of these three witnesses had, at some point, been incarcerated with the defendant while he was serving time for an unrelated sexual assault charge. Kenneth S. Buckingham testified that the defendant confided in him that he accidentally had choked an intoxicated young girl to death while having sex with her and that he then dismembered the body and disposed of it in lobster pots "in the sound." Buckingham also testified that a person named P.J. had been with the defendant and that victim prior to the death. Michael S. Douton, Jr., testified that the defendant had told him that the victim "was in the river" and that "they would never convict him because they would never find [her] body," which had been eaten by crabs. Buckingham and Douton, like Allain, each testified that they hoped to receive some consideration from the state in return for their testimony. Zee Y. Ching, Jr., unlike the other witnesses, was not incarcerated or facing legal jeopardy at the time of trial. Ching testified that the defendant admitted that he had raped and killed a fifteen year old girl on his boat and that he had hidden the body in a well before ultimately dumping it in Long Island Sound.

_____

[3] Although Allain's testimony was unclear on this point, the jury reasonably could have concluded that the path on which Allain and the defendant spoke is the same path to which the defendant confessed having taken the victim.

State *v.* Leniart

The jury returned a verdict of guilty on all counts. The court merged the verdicts into a single conviction of capital felony and sentenced the defendant to a term of life imprisonment without the possibility of release. On appeal to the Appellate Court, the defendant raised various challenges to the trial court's evidentiary rulings and also claimed, relying in part on the common-law corpus delicti rule, that the evidence was insufficient to sustain his conviction. *State* v. *Leniart*, supra, 166 Conn. App. 146–49. The Appellate Court rejected the defendant's sufficiency claim but concluded that the trial court incorrectly had excluded the polygraph pretest interview videotape, as well as expert testimony relating to the credibility of jailhouse informants. The Appellate Court then concluded that those evidentiary rulings substantially affected the verdict and, accordingly, remanded the case for a new trial.[4]

We granted the state's petition for certification to appeal, limited to the questions of whether the Appellate Court correctly concluded that the trial court had erroneously excluded the polygraph pretest interview videotape and expert testimony regarding jailhouse informant testimony and that those rulings substantially affected the verdict. *State* v. *Leniart*, 323 Conn. 918, 150 A.3d 1149 (2016). We also granted the defendant's petition for certification to appeal, limited to the question of whether the Appellate Court properly applied the corpus delicti rule in concluding that there was sufficient evidence to sustain his conviction of murder and capital felony. *State* v. *Leniart*, 323 Conn. 918, 918–19, 149 A.3d 499 (2016). Additional facts and procedural history will be set forth as necessary.

---

[4] Judge Flynn, writing separately, concluded that the Appellate Court majority had, in some respects, improperly articulated and applied the corpus delicti rule, but he agreed that the defendant could not prevail on his corpus delicti claim. See *State* v. *Leniart*, supra, 166 Conn. App. 228 (*Flynn, J.*, concurring in part and dissenting in part).

State *v.* Leniart

## I

## CORPUS DELICTI RULE

We first consider the claim raised in the defendant's appeal. Before the Appellate Court, the defendant argued, for the first time; see footnote 7 of this opinion; that the evidence was insufficient to sustain his conviction because, under the common-law corpus delicti rule, the state had failed to establish beyond a reasonable doubt each element of the crimes charged. As we explain more fully hereinafter, the corpus delicti rule, although defined and applied differently in other jurisdictions, and even in our prior cases, generally "prohibits a prosecutor from proving the [fact of a transgression] based solely on a defendant's extrajudicial statements."[5] Black's Law Dictionary (7th Ed. 1999) p. 346. In the present case, the defendant argued that there was no evidence, aside from his various alleged admissions, that the victim actually was dead, which is the corpus delicti of murder. See *State* v. *Tillman*, 152 Conn. 15, 20, 202 A.2d 494 (1964) ("[T]he corpus delicti consists of the occurrence of the specific kind of loss or injury embraced in the crime charged. . . . [I]n a homicide case, the corpus delicti is the fact of the death, whether or not feloniously caused, of the person whom the accused is charged with having killed or murdered." [Footnote omitted.]).

In order to identify the specific version of the rule to be applied in the present case, the Appellate Court reviewed the purpose and history of the corpus delicti rule. Believing itself to be bound by cases such as *State* v. *Uretek, Inc.*, 207 Conn. 706, 543 A.2d 709 (1988) (*Uretek*), a majority of the Appellate Court held that the corpus delicti rule is merely an evidentiary rule that

_____
[5] For the reasons discussed in part I B of this opinion, some courts and commentators refer to Connecticut's version of the corpus delicti rule as the corroboration rule.

State *v.* Leniart

bars the use of a defendant's own uncorroborated extra-judicial confessions or admissions[6] to prove the corpus delicti of a crime. *State* v. *Leniart*, supra, 166 Conn. App. 151, 159. Because, in its view, the rule is one of admissibility, the Appellate Court majority concluded that the defendant had abandoned his corpus delicti claim by failing to object at trial to the testimony of Allain, Buckingham, Ching, and Douton, each of whom testified that the defendant had confessed to killing the victim. Id., 151.

Judge Flynn, writing a separate opinion concurring in part and dissenting in part, concluded that the corpus delicti rule is a hybrid rule—it is an evidentiary rule, insofar as it provides that a defendant's confession is inadmissible in the absence of some corroborating evidence that a crime has been committed, but it also is a substantive rule of criminal law providing that a defendant cannot be convicted of a crime when the only evidence that the crime has been committed is the defendant's own uncorroborated confession. See id., 236–37. Judge Flynn also opined that the rule should be applied more strictly with respect to murder than with respect to other crimes, in that the state should be required to set forth independent evidence of the victim's death and not simply extrinsic evidence that tends to establish the credibility of the defendant's confession. Id., 236. All three members of the Appellate Court panel agreed, however, that the state had, in any event, set forth sufficient, independent evidence of the victim's death to satisfy the corpus delicti rule, regardless of how that rule is defined. Id., 171–75; id., 237 (*Flynn, J.*, concurring in part and dissenting in part).

In his certified appeal, the defendant asks us to clarify that (1) the corpus delicti rule is, at least in part, a

[6] For brevity, subsequent references to "confessions" are intended to refer to the alleged extrajudicial confessions or admissions of a criminal defendant.

State *v.* Leniart

substantive rule and, therefore, that his claim is review-
able on appeal despite his failure to object to the admis-
sion of testimony regarding the confessions at trial, and
(2) the rule bars a murder conviction on the basis of a
defendant's confession in the absence of independent
evidence that the alleged victim is dead. The defendant
further contends that, in the present case, there was
not sufficient extrinsic evidence to establish that the
victim was dead. We agree with the defendant and Judge
Flynn that our state's common-law corpus delicti rule
is a hybrid rule that has both substantive and evidentiary
components, and that unpreserved corpus delicti claims
are, therefore, reviewable on appeal. We agree with the
Appellate Court majority, however, that the rule does
not impose a higher standard of proof with respect to
murder than with respect to other crimes. Finally, we
conclude that there was sufficient, independent corrob-
orating evidence both of the victim's death and of the
credibility of the defendant's confessions for the jury
to have found the defendant guilty beyond a reason-
able doubt.[7] Accordingly, we affirm the judgment of the
Appellate Court with respect to this claim.

A

Assuming, arguendo, that the state is correct that the
defendant's corpus delicti claim was not preserved at
trial, we must determine as a threshold matter whether

[7] Because we agree with the defendant that the corpus delicti rule is a
hybrid rule that implicates his due process rights and, therefore, that his
failure to object to admission of his alleged confessions does not preclude
appellate review, we need not consider his alternative arguments that his
corpus delicti claim is properly preserved or should be reviewed for
plain error.

The defendant contends that there also is insufficient evidence to prove
that he sexually assaulted, kidnapped, and intentionally killed the victim.
Although those issues are not encompassed within the certified question,
we note that Allain's testimony, if credited by the jury, and as corroborated
by independent evidence, was sufficient to establish the essential elements
of all of the charged crimes.

State *v.* Leniart

the corpus delicti rule is merely evidentiary or whether it encompasses a substantive component that invokes the defendant's due process rights. If it is merely an evidentiary rule of admissibility, then the defendant's failure to raise his claim at trial precludes appellate review. See, e.g., *State* v. *Gonzalez*, 315 Conn. 564, 591, 109 A.3d 453, cert. denied, U.S. , 136 S. Ct. 84, 193 L. Ed. 2d 73 (2015). On the other hand, if the rule establishes, as a substantive matter, the type or degree of evidence necessary to establish that elements of a crime have been proven beyond a reasonable doubt, then the defendant's claim is reviewable on appeal regardless of whether he raised it at trial.[8] See, e.g., *State* v. *Adams*, 225 Conn. 270, 275–76 n.3, 623 A.2d 42 (1993) (unpreserved insufficiency of evidence claims implicate due process rights and are reviewable on appeal). Whether the corpus delicti rule is evidentiary, substantive, or a hybrid of the two is a question of law that we review de novo.

The parties and the Appellate Court have identified four factors that are relevant to the question of whether our state's corpus delicti rule has both evidentiary and substantive components: this court's precedents, the approach followed by other jurisdictions, the rationales that underlie the rule, and issues regarding how the rule is applied in practice. Our review of these factors compels the conclusion that corpus delicti is a hybrid rule and, therefore, that the defendant's corpus delicti claim is reviewable.[9]

---

[8] Aside from the question of reviewability, the distinction determines the remedy that would be available to the defendant should he prevail on his corpus delicti claim. If the confession testimony were found to have been improperly admitted, then he would be entitled to a new trial, assuming that the error was not deemed harmless, whereas a finding that the state's evidence was insufficient to sustain a conviction would require his acquittal. See *Burks* v. *United States*, 437 U.S. 1, 16, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978); *State* v. *Ferrell*, 191 Conn. 37, 46, 463 A.2d 573 (1983).

[9] We note that it is not uncommon for substantive rules to have evidentiary implications as well. See, e.g., *Manderson* v. *Chet Morrison Contractors, Inc.*, 666 F.3d 373, 381 (5th Cir. 2012) (collateral source rule "can apply as

State *v.* Leniart

1

The Appellate Court began by comprehensively
"reviewing the purpose, history, and present scope of
the corpus delicti rule in Connecticut.'' *State* v. *Leniart*,
supra, 166 Conn. App. 151–52. Although we have not
previously analyzed the issue in any depth, our corpus
delicti decisions, if not entirely consistent, generally
support the conclusion that the rule is a hybrid one
that both bars the admissibility of uncorroborated con-
fession evidence and imposes a substantive due process
requirement. In one case, for example, the defendant
claimed that "there was insufficient extrinsic evidence
of the corpus delicti to warrant the court's admission
of his confessions . . . .'' *State* v. *Doucette*, 147 Conn.
95, 97, 157 A.2d 487 (1959), overruled in part by *State*
v. *Tillman*, 152 Conn. 15, 20, 202 A.2d 494 (1964). In
*Doucette*, this court agreed that "[p]roperly this [extrin-
sic] evidence should be introduced and the court satis-
fied of its substantial character and sufficiency to
render the confession admissible, before the latter is
allowed in evidence.'' (Internal quotation marks omit-
ted.) *State* v. *Doucette*, supra, 100. At the same time,
we made clear in describing the rule that it not only
governs the admission of confession evidence but also
sets the conditions for obtaining a conviction. "[T]he
corpus delicti,'' we said, "cannot be established by the
[extrajudicial] confession of the defendant unsupported
by corroborative evidence.'' (Internal quotation marks
omitted.) Id., 98–99. "The Connecticut rule, which we
reaffirm, is that, although the confession is evidence
tending to prove both the fact that the crime [charged]
was committed . . . and the defendant's agency
therein, *it is not sufficient of itself to prove the former,*

evidentiary rule or as substantive rule of damages, or both''); *Strout* v.
*Paisley*, Docket No. CIV. 00-107-B (MJK), 2000 WL 1900313, *4 (D. Me.
December 4, 2000) ("any rule, whether [common-law] or statutory, may
have both substantive and evidentiary components'').

State *v.* Leniart

and, without evidence aliunde of facts also tending to prove the corpus delicti, *it is not enough to warrant a conviction . . . .*'' (Emphasis added; internal quotation marks omitted.) Id., 99.[10]

Since this court decided *Doucette*, a number of our decisions have stated or implied that the corpus delicti rule encompasses both substantive and evidentiary components and, therefore, that corpus delicti claims are reviewable even if not raised at trial. See, e.g., *State* v. *Farnum*, 275 Conn. 26, 33, 878 A.2d 1095 (2005); *State* v. *Grant*, 177 Conn. 140, 144, 411 A.2d 917 (1979); *State* v. *Tillman*, supra, 152 Conn. 18; but see *State* v. *Oliveras*, 210 Conn. 751, 757, 557 A.2d 534 (1989) (leaving open reviewability question with respect to recently reformulated corpus delicti rule). By contrast, in no recent decision have we indicated that the rule is exclusively evidentiary or that unpreserved corpus delicti claims are unreviewable on appeal.

The Appellate Court majority, concluding that the corpus delicti rule is purely evidentiary, understandably believed itself to be bound by *State* v. *Uretek, Inc.*, supra, 207 Conn. 706.[11] See *State* v. *Leniart*, supra, 166 Conn. App. 161. In *Uretek*, we declined to consider the named defendant's corpus delicti argument because the defendant had not preserved the argument at trial. *State* v. *Uretek, Inc.*, supra, 713. Our review of the issue was limited to the following sentence: ''[The defendant's]

---

[10] As we discuss subsequently in this opinion, the nature of the burden imposed on the prosecution under the corpus delicti rule was later refined by this court in *State* v. *Tillman*, supra, 152 Conn. 20. See part I B 1 of this opinion.

[11] The Appellate Court believed that it was bound by *Uretek*, notwithstanding our subsequent decision in *State* v. *Farnum*, supra, 275 Conn. 26, because, in *State* v. *Heredia*, 139 Conn. App. 319, 325 and n.3, 55 A.3d 598 (2012), cert. denied, 307 Conn. 952, 58 A.3d 975 (2013), a different panel of the Appellate Court had announced that it would adhere to *Uretek* until that decision was expressly overruled by this court. See *State* v. *Leniart*, supra, 166 Conn. App. 161–62.

State *v.* Leniart

corpus delicti claim does not implicate a fundamental constitutional right, and, therefore, this court will not review this contention. *State* v. *George*, 194 Conn. 361, 372, 481 A.2d 1068 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 963, 83 L. Ed. 2d 968 (1985); *State* v. *Gooch*, 186 Conn. 17, 18, 438 A.2d 867 (1982); *State* v. *Evans*, 165 Conn. 61, 70, 327 A.2d 576 (1973).'' *State* v. *Uretek, Inc.*, supra, 713.

We agree with the defendant that *Uretek* must be overruled to the extent that it suggested that corpus delicti claims do not implicate fundamental due process rights and, therefore, are not reviewable on appeal unless preserved at trial. The decision provided no support for that conclusory proposition, which, as we have discussed, was inconsistent with both our prior and subsequent corpus delicti cases. Notably, none of the three cases that *Uretek* cited in support of that proposition involved or even referenced the corpus delicti rule. In addition, *Uretek* was decided prior to *State* v. *Adams*, supra, 225 Conn. 275–76 n.3, in which we ruled that unpreserved insufficiency of the evidence claims are always reviewable on appeal.

2

It also is instructive to consider how the corpus delicti rule has been construed and applied by our sister states and the federal courts. Of those states that continue to apply a corpus delicti rule, the vast majority treat the rule as either substantive or a substantive and evidentiary hybrid. See, e.g., *Langevin* v. *State*, 258 P.3d 866, 873 (Alaska App. 2011) (''[M]ost American jurisdictions follow the implicit element approach to corpus delicti. . . . Under this approach, corpus delicti is an element of the government's proof—and the general rule is that a defendant is entitled to a [judgment] of acquittal if the government fails to offer proof of each element of the crime.'' [Citations omitted; internal quotation marks

State *v.* Leniart

omitted.]); see also 1 K. Broun, McCormick on Evidence (7th Ed. 2013) § 145, p. 804; 1 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 1.4 (b), p. 31. By contrast, only a handful of our sister states treat the rule solely as one of admissibility.[12]

In addition, although the United States Supreme Court has not expressly resolved the question, several federal circuit courts of appeals understand the high court to have adopted a hybrid version of the rule. See, e.g., *United States* v. *Dickerson*, 163 F.3d 639, 642 (D.C. Cir. 1999) (explaining that United States Supreme Court has "created something of a hybrid rule having elements both of admissibility and sufficiency"); see also *United States* v. *McDowell*, 687 F.3d 904, 912 (7th Cir. 2012) ("[t]he corroboration principle sometimes comes into play in the trial court's decision to admit the defendant's confession and also if he later challenges the sufficiency of the evidence"); *United States* v. *Singleterry*, 29 F.3d 733, 737 (1st Cir.) (discussing dual nature of rule), cert. denied, 513 U.S. 1048, 115 S. Ct. 647, 130 L. Ed. 2d 552 (1994). Moreover, every federal circuit treats the corpus delicti rule as having some substantive component. See generally *United States* v. *Marshall*, 863 F.2d 1285, 1287 (6th Cir. 1988) (reviewing topic and citing cases). That so many of our sister courts treat the rule as substantive not only provides persuasive authority for following that approach but also mitigates any concerns that the state has raised; see part I A 4 of this opinion; that applying the rule substantively would be impracticable or inappropriate.

3

We also agree with McCormick on Evidence, which posits that the rationales that gave rise to and continue

_____

[12] See, e.g., *Langevin* v. *State*, supra, 258 P.3d 873; *People* v. *Konrad*, 449 Mich. 263, 269, 536 N.W.2d 517 (1995); *State* v. *Jones*, 427 S.W.3d 191, 195 (Mo. 2014).

State *v.* Leniart

to justify the corpus delicti rule support treating that
rule as substantive. See 1 K. Broun, supra, § 145, p. 805.[13]
"The rationale for the requirement is that inculpatory
confessions and admissions are frequently unreliable
for many reasons, including coercion, delusion, neuro-
sis, self-promotion, or protection of another person.
Jurors find such statements inherently powerful, how-
ever, and may vote to convict based upon such state-
ments alone. . . . The [corpus delicti] rule, which is
intended to prevent convictions of innocent defendants,
also encourages better law enforcement because police
and prosecutors cannot rely solely on a defendant's
statements to prove a case." (Citation omitted.) *United
States* v. *Bryce*, 208 F.3d 346, 354–55 (2d Cir. 1999).

Treating the corpus delicti rule as evidentiary is fully
consistent with the purpose of the rules of evidence,
which is to bar unreliable evidence offered to influence
the trier of fact. See, e.g., *Pagano* v. *Ippoliti*, 245 Conn.
640, 656, 716 A.2d 848 (1998) (*McDonald, J.*, dissenting);
see also *State* v. *Beverly*, 224 Conn. 372, 375, 618 A.2d
1335 (1993) ("[t]he corpus delicti rule is a rule of evi-
dence"). However, as we discuss at greater length here-
inafter; see part I B 1 of this opinion; the rule did not
originate exclusively, or even primarily, to assist the
jury in assessing the credibility of confession evidence,
or even to ensure that false confessions are not entered
into evidence. Rather, the rule has a more fundamental
purpose, namely, to avoid the patent injustice of con-
victing an innocent person—frequently one who either
is mentally ill or has been subject to coercive interroga-
tion—of an imaginary crime. See *State* v. *Arnold*, 201
Conn. 276, 287, 514 A.2d 330 (1986); D. Moran, "In

_____

[13] We note that McCormick on Evidence favors treating the rule as exclu-
sively substantive. See 1 K. Broun, supra, § 145, p. 805. Other scholars,
however, adopt the hybrid approach. See, e.g., T. Mullen, "Rule Without
Reason: Requiring Independent Proof of the Corpus Delicti as a Condition
of Admitting an Extrajudicial Confession," 27 U.S.F. L. Rev. 385, 386 and
n.5 (1993).

State *v.* Leniart

Defense of the Corpus Delicti Rule,'' 64 Ohio St. L.J. 817, 817 (2003). Those concerns lie at the core of our due process protections, and we can perceive no reason why the injustice of trying and convicting a possibly troubled individual for a nonexistent crime should be compounded by denying that individual the opportunity for appellate review when his or her attorney fails to raise a timely and appropriate objection.

Furthermore, to the extent that a purpose of the rule is to eliminate incentives for law enforcement to obtain false confessions through coercive means, while at the same time promoting more thorough investigative practices, corpus delicti fairly may be characterized as a type of constitutional prophylactic rule. See T. Mullen, ''Rule Without Reason: Requiring Independent Proof of the Corpus Delicti as a Condition of Admitting an Extrajudicial Confession,'' 27 U.S.F. L. Rev. 385, 401 (1993) (describing purposes of rule); see also C. Rogers, ''Putting Meat on Constitutional Bones: The Authority of State Courts To Craft Constitutional Prophylactic Rules Under the Federal Constitution,'' 98 B.U. L. Rev. 541, 548, 555–56 (2018) (defining constitutional prophylactic rules). We are not aware of any such rule the alleged violation of which must be raised at trial in order to be reviewable on appeal. See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989) (establishing requirements for defendant to prevail on claim of constitutional error not preserved at trial). Accordingly, the rationales that underlie the rule are fully consistent with the majority position that corpus delicti is a substantive rule of criminal law to be applied in reviewing the sufficiency of the state's evidence and not merely an evidentiary rule regarding the admissibility of confessions.

4

We next consider several reasons offered by the state and the Appellate Court majority as to why corpus

State *v.* Leniart

delicti should be treated solely as a rule of admissibility. First, the Appellate Court decision starts with the premise that, if the rule implicates the sufficiency of the evidence, then the jury must be involved in some way in resolving corpus delicti questions. See *State* v. *Leniart*, supra, 166 Conn. App. 166. But, that line of reasoning proceeds, courts typically do not instruct jurors that they must find the corpus delicti of a crime established independent of the defendant's own incriminating statements. Id. In addition, the Appellate Court majority reasoned that, if jurors are to be tasked with finding that the corpus delicti has been established independent of any confession evidence, then they, having already heard the defendant's confessions, would be required to set those confessions aside while objectively evaluating the strength of any independent, corroborating evidence. The Appellate Court majority opined that that expectation is not realistic. Id., 167–68. Thus, the court concluded, the rule must not be substantive.

We are not persuaded that the Appellate Court's starting premise is correct. Many of the courts that treat the corpus delicti rule as a substantive rule that implicates the sufficiency of the evidence do not involve the jury in its application. See, e.g., *United States* v. *McDowell*, supra, 687 F.3d 912 ("[W]e have held that the district court is not obligated to instruct the jury on the requirement of corroboration. . . . Following the lead of two other circuits, we concluded . . . that the matter was better left to the trial judge, and that the standard instructions regarding the government's burden of proof and the presumption of innocence are generally sufficient." [Citation omitted.]). In those jurisdictions, the trial court makes an initial determination as to whether there is sufficient corroboration to allow the jury to hear the defendant's confessions. If the court allows the confessions—and thus the case—to reach the jury, the jury is then tasked with assessing whether

State *v.* Leniart

all of the evidence, including the confessions and any extrinsic evidence, is sufficient to establish the defendant's guilt beyond a reasonable doubt.

In *United States* v. *Dickerson*, supra, 163 F.3d 642–43, the United States Court of Appeals for the Tenth Circuit explained why the fact that the rule involves a substantive component that implicates the defendant's due process rights does not require the involvement of the jury in its application. Corpus delicti, that court explained, is "essentially . . . a duty imposed upon courts to ensure that the defendant is not convicted on the basis of an uncorroborated out-of-court-statement." Id., 642. In this respect, the rule places the trial court in the same gatekeeping role that it occupies in deciding a motion for a judgment of acquittal. Id., 643. In that capacity, the court must determine whether there is sufficient evidence to support a finding of guilt before sending the case to the jury. As the court noted in *Dickerson*, however, "no one thinks it follows from this that the jury must be given an opportunity to reconsider for itself the judge's decision on a motion for judgment of acquittal." Id. The same logic applies, a fortiori, to the corpus delicti rule, which requires only that the trial court make the threshold determination that there are some "corroborating facts [that] tend to produce a confidence in the truth of the confession . . . ." (Internal quotation marks omitted.) *State* v. *Hafford*, 252 Conn. 274, 317, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000); see also id. ("it is sufficient if the corroboration merely fortifies the truth of the confession" [internal quotation marks omitted]).

The Appellate Court majority also was of the view that, because "the rule itself is not constitutional in nature and jurisdictions are free to abandon it altogether . . . it makes little sense to characterize it as an implicit element of the state's case that is subject to appellate review like all other unpreserved sufficiency of the evidence claims." *State* v. *Leniart*, supra,

State *v.* Leniart

166 Conn. App. 167. In a footnote, the majority acknowledged, however, that the rule could take on constitutional implications if the legislature were to formally adopt it. Id., 167 n.19.

We do not agree that the question of whether the corpus delicti rule is substantive in nature and, thus, implicates the defendant's constitutional rights, hinges on whether it has been formally codified. It is true that "[t]he adoption of the comprehensive Penal Code in 1969 abrogated the common-law authority of Connecticut courts to impose criminal liability for conduct not proscribed by the legislature." *Luurtsema* v. *Commissioner of Correction*, 299 Conn. 740, 772, 12 A.3d 817 (2011). At the same time, however, the savings clause to the Penal Code provides, and our cases recognize, that the common law is preserved under the code unless clearly preempted; the code does not bar our courts from "recognizing other principles of criminal liability or other defenses not inconsistent with" statute. General Statutes § 53a-4; see, e.g., *State* v. *Terwilliger*, 314 Conn. 618, 654, 104 A.3d 638 (2014) (self-defense); *State* v. *Courchesne*, 296 Conn. 622, 679–88 and n.44, 998 A.2d 1 (2010) (born alive principle); *State* v. *Walton*, 227 Conn. 32, 45, 630 A.2d 990 (1993) (vicarious liability of conspirator). As the cited examples indicate, common-law rules and principles that are neither constitutionally required nor expressly adopted by statute nevertheless may clarify the elements of, or defenses to, a crime in ways that have constitutional implications. The corpus delicti rule is no different.

Finally, the state argues that it would be fundamentally unfair to review unpreserved corpus delicti claims because prosecutors will not have been put on notice at the time of trial that there may be a corpus delicti problem and, therefore, will not have the opportunity to identify and introduce the additional evidence necessary to corroborate a defendant's naked confession.

State *v.* Leniart

We trust that the present opinion will serve as adequate notice. See *Burks* v. *United States*, 437 U.S. 1, 16, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978) ("the prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble").

For all of these reasons, we conclude that the corpus delicti rule is a hybrid rule that not only governs the admissibility of confession evidence but also imposes a substantive requirement that a criminal defendant may not be convicted solely on the basis of a naked, uncorroborated confession. Accordingly, the defendant's corpus delicti claim is reviewable even though it was not properly preserved at trial.

B

Having established that our corpus delicti rule has a substantive component that implicates the defendant's due process rights and, therefore, that his claim is reviewable, we now turn our attention to the merits of his claim. To resolve the claim, we first must address another dispute between the parties, and among the Appellate Court panel, regarding how the rule applies in murder cases.

1

The defendant contends, in essence, that the corpus delicti rule imposes different, more stringent standards with respect to murder than with respect to less serious crimes. Before we set forth the defendant's argument, it will be helpful briefly to review the evolution of the corpus delicti rule in Connecticut.

Although our cases contain earlier references to the rule; see, e.g., *State* v. *Carta*, 90 Conn. 79, 83, 96 A. 411 (1916); the corpus delicti rule was first fully articulated in 1933. See *State* v. *LaLouche*, 116 Conn. 691, 166 A. 252 (1933), overruled in part by *State* v. *Tillman*, 152

State *v.* Leniart

Conn. 15, 20, 202 A.2d 494 (1964). In *LaLouche*, this court characterized the rule as follows: "Undoubtedly the general rule is that the corpus delicti cannot be established by the [extrajudicial] confession of the defendant unsupported by corroborative evidence. . . . There are cases which hold in effect that it must be established by evidence independent of the defendant's confession and that without such proof evidence of the confession is inadmissible. . . .

"The overwhelming weight of authority and of reason, however, recognizes that such a confession or admission may be considered in connection with other evidence to establish the corpus delicti, and that it is not necessary to prove it by evidence entirely independent and exclusive of the confession. . . . In order to warrant a conviction in a given case, it must be shown (1) that a crime has been committed, and (2) that the person charged therewith was the active agent in the commission thereof. But, while it is necessary that both of said essential facts should be proved beyond a reasonable doubt, it does not follow that each must be proved independently of, and apart from, the other, or that either must be proved independently of, and without regarding the confession of the person charged with the crime. The confession is evidence tending to prove both the fact that the crime was committed and the defendant's agency therein. . . . But it is not sufficient of itself to prove the former, and, without [independent] evidence . . . of facts also tending to prove the corpus delicti, it is not enough to warrant a conviction. There must be such extrinsic corroborative evidence as will, when taken in connection with the confession, establish this fact in the minds of the jury beyond a reasonable doubt.

"The independent evidence must tend to establish that the crime charged has been committed and must be material and substantial, but need not be such as

State *v.* Leniart

would establish the corpus delicti beyond a reasonable doubt apart from the confession. . . . [T]his evidence should be introduced and the court satisfied of its substantial character and sufficiency to render the confession admissible, before the latter is allowed in evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *LaLouche*, supra, 116 Conn. 693–95; see also *State* v. *Doucette*, supra, 147 Conn. 98–100 (reaffirming rule).

In the decades since we decided *LaLouche* and *Doucette*, and consistent with the modern trend, we have reduced in several respects the burden that the corpus delicti rule imposes on the state in prosecuting a crime.[14] First, in *State* v. *Tillman*, supra, 152 Conn. 20, we joined a small handful of jurisdictions to have departed from the traditional rule that the state must establish, by independent evidence,[15] both that an injury or loss occurred and that the loss was feloniously caused.[16] In *Tillman*, we held that the corpus delicti that must be established by independent evidence encompasses only the former element, namely, the specific kind of loss or injury embraced in the crime charged. Id. "Under [this definition], in a homicide case,

---

[14] See D. Moran, supra, 64 Ohio St. L.J. 818 ("[t]he corpus delicti rule has fallen into disfavor in recent decades"); id., 835 ("the last half of the twentieth century has produced a distinct trend away from the corpus delicti rule" [internal quotation marks omitted]); T. Mullen, supra, 27 U.S.F. L. Rev. 389 (noting modern trend "reducing the quantum of evidence necessary to establish the corpus delicti"); T. Mullen, supra, 418 ("[m]ost courts have acted with [half measures] to unburden themselves of the corpus delicti rule").

[15] Unless otherwise noted, we use the term "independent evidence" to refer to evidence independent of any purported admissions, confessions, or related extrajudicial statements of the accused.

[16] See T. Mullen, supra, 27 U.S.F. L. Rev. 389 and n.17 (listing Connecticut as one of only four states to adhere to narrower version of rule); see also *United States* v. *Woods*, 484 F.2d 127, 132 (4th Cir. 1973) (describing this view as " 'orthodox' " but noting that it has not found widespread acceptance), cert. denied, 415 U.S. 979, 94 S. Ct. 1566, 39 L. Ed. 2d 875 (1974).

State *v.* Leniart

the corpus delicti is the fact of the death, whether or not feloniously caused, of the person whom the accused is charged with having killed or murdered.'' Id.; but see *State* v. *Courchesne*, supra, 296 Conn. 791 n.5 (*Zarella, J.*, concurring in part and dissenting in part) (adhering to traditional rule that corpus delicti includes fact that ''death was produced through criminal agency'' [internal quotation marks omitted]).

Next, in *State* v. *Harris*, 215 Conn. 189, 193–94, 575 A.2d 223 (1990), we modified the rule as it applies to crimes, such as driving under the influence, that proscribe certain undesirable conduct but do not necessarily entail any particular injury or loss. Specifically, relying on the decision of the United States Supreme Court in *Opper* v. *United States*, 348 U.S. 84, 75 S. Ct. 158, 99 L. Ed. 101 (1954), we concluded that, for crimes of that sort, the state need not establish the corpus delicti of the crime through extrinsic evidence. Rather, the state need only ''introduce substantial independent evidence [that] would tend to establish the trustworthiness of the [defendant's] statement.'' (Internal quotation marks omitted.) *State* v. *Harris*, supra, 194.

Most recently, in *State* v. *Hafford*, supra, 252 Conn. 317, we held that this trustworthiness rule set forth in *Harris*, also known as the corroboration rule, now ''applies to all types of crimes, not only those offenses that prohibit conduct and do not result in a specific loss or injury.'' In other words, post-*Hafford*, a confession is now sufficient to establish the corpus delicti of any crime, without independent extrinsic evidence that a crime was committed, as long as there is sufficient reason to conclude that the confession is reliable.

In *Hafford*, we justified this departure from our established corpus delicti jurisprudence by observing that the corroboration rule (1) has been embraced both by the federal courts and by an increasing number of state

State *v.* Leniart

courts, (2) is favored by a number of respected commentators, and (3) is more reasonable and more workable than the traditional corpus delicti rule. Id., 316–17. At the same time, we expressed confidence that the corroboration rule, as applied in *Harris*, would continue to "fulfill the avowed purpose and reason for the existence of the corpus delicti rule [by] protect[ing] accused persons against conviction of offenses that have not in fact occurred . . . and prevent[ing] errors in convictions based upon untrue confessions alone." (Internal quotation marks omitted.) Id., 316.

The defendant does not deny that, under *Hafford*, the state may rely, in most instances, on the accused's statements to establish all of the elements of a charged crime, as long as there is sufficient, independent evidence to establish the trustworthiness of those statements. The defendant emphasizes, however, that, in *Hafford*, we left open the possibility that extrinsic evidence of the corpus delicti still might be required before a defendant can be convicted of murder on the basis of a confession. Specifically, he draws our attention to a footnote in which this court noted that "proving the trustworthiness of a defendant's confession to a crime resulting in injury or loss often will require evidence of that injury or loss. For example, a confession to a homicide likely would not be trustworthy without evidence of the victim's death." Id., 317 n.23. The Appellate Court majority in the present case dismissed the importance of that statement, concluding that the "cryptic footnote," which was merely dictum, was too conclusory and equivocal to indicate that we intended to carve out an exception to the corroboration rule for murder prosecutions. *State* v. *Leniart*, supra, 166 Conn. App. 156–58. Judge Flynn disagreed, writing that, in his view, independent proof of death should be required in any murder case. Id., 229–32 (*Flynn, J.*, concurring in part and dissenting in part).

State *v.* Leniart

At first blush, requiring the prosecution to prove the fact of death by extrinsic evidence in a murder case would seem to be consistent with the history of the corpus delicti rule, which was inspired by two cases— centuries and continents apart—in which defendants were wrongly convicted of the murders of victims who were still very much alive.[17] See D. Moran, supra, 64 Ohio St. L.J. 829–30; T. Mullen, supra, 27 U.S.F. L. Rev. 399–401; R. Perkins, "The Corpus Delicti of Murder," 48 Va. L. Rev. 173, 173–75 (1962). The first, known as Perry's Case, arose from the disappearance of William Harrison from his home in Chipping Campden, England, in 1660. See generally J. Paget, Legal Recreations: Judicial Puzzles (1876) pp. 37–67. When the septuagenarian Harrison failed to return from his regular two mile walk to collect rents for the Viscountess Campden, a servant, John Perry, was sent to search for him. Id., p. 39. A bloodied band, a torn hat, and a comb belonging to Harrison were found, and Perry was arrested. Id., p. 40. After several interrogations, however, John Perry confessed that he had conspired with his mother and brother to rob Harrison, that his brother had choked Harrison to death, and that he had disposed of the body in a swamp. Id., p. 41. The three Perrys were tried, convicted of Harrison's murder, and hanged within the week. Id., p. 43. Several years later, a haggard Harrison mysteriously reappeared in Campden, claiming to have

___

[17] We note that, although the term corpus delicti, which literally translates to "body of the crime," has led to some confusion, it never has been the rule that a victim's body must be produced before the state can secure a murder conviction. See D. Moran, supra, 64 Ohio St. L.J. 828 and n.68; R. Perkins, "The Corpus Delicti of Murder," 48 Va. L. Rev. 173, 182 (1962). As has been long recognized and frequently remarked, such a rule would serve only to incentivize gangland style murders in which victim's bodies are incinerated, dissolved, or dumped in the sea. See *Virgin Islands* v. *Harris*, 938 F.2d 401, 415 (3d Cir. 1991) ("[A] murderer should not be entitled to acquittal simply because he successfully disposes of a victim's body. That is one form of success for which society has no reward." [Internal quotation marks omitted.]); *United States* v. *Gibert*, 25 F. Cas. 1287, 1290 (C.C.D. Mass. 1834) (No. 15,204) (requiring production of body "would amount to a universal condonation of all murders committed on the high seas").

State *v.* Leniart

been captured by men on horseback, transferred to a Turkish ship, and sold into slavery, from which he had ultimately escaped.[18] Id., pp. 44–49.

The second case centers on equally incredible but somewhat less tragic events that took place in Manchester, Vermont. See E. Borchard, Convicting the Innocent: Sixty-Five Actual Errors of Criminal Justice (1932) pp. 14–21. Two brothers, Stephen Boorn and Jesse Boorn, were known to be ill-inclined toward Russel Colvin, their eccentric brother-in-law. Id., p. 14. Colvin vanished one day in May, 1812, while his wife was away, and, after a time, suspicion of foul play fell on Stephen and Jesse. Id., pp. 14–15. Seven years and many rumors and superstitions later, after a dog had dug up some animal bones near the Boorn property, Jesse was interrogated by a justice of the peace and implicated Stephen in Colvin's "murder." Id., pp. 15–16. A jailhouse informant, Silas Merrill, subsequently informed a grand jury that Jesse had confessed to him that both Stephen and Jesse had been involved in Colvin's death. Id., p. 17. Stephen subsequently confessed to killing Colvin and disposing of his remains in a river and under an old tree stump. Id., pp. 17–18. Stephen then was tried, convicted, and sentenced to hang. Id., p. 18.

In that case, however, fortune, together with the slower and more cautiously moving wheels of justice in nineteenth century Vermont, spared Stephen the same fate as the Perrys. Two months before the scheduled execution, one of Stephen's attorneys published an article in the New York Evening Post in an attempt to locate Colvin. Id., p. 18. Through an unlikely conflu-

[18] Although the Perry tale apparently boasts sufficient indicia of historical reliability to not be deemed apocryphal; see P. Clifford, The Campden Wonder, available at http://www.campdenwonder.plus.com/Sources.htm (last visited September 4, 2019); details of the story vary from one account to another. Compare *State* v. *Bishop*, 431 S.W.3d 22, 46 (Tenn. 2014), with A. Howard, Rope: A History of the Hanged (2016) pp. 145–46.

State *v.* Leniart

ence of events, Colvin, who may have been mentally ill, was found to be living in New Jersey under a different identity, and Stephen was exonerated. Id., pp. 14, 20–21.

Returning to the question before us, courts and commentators have articulated several rationales for the corpus delicti rule: "(1) protecting the mentally unstable from the consequences of their false confessions, (2) avoiding reliance on repudiated confessions out of concern for voluntariness, and (3) promoting better police work by requiring the prosecution to prove its case without the aid of confessions." T. Mullen, supra, 27 U.S.F. L. Rev. 401. As the Perry and Boorn cases demonstrate, however, the rule originated in response to, and was most powerfully justified by, "a narrow, practical problem: how to ensure that after a murderer was executed the supposed murder victim did not show up to cast doubt on the propriety of the execution." Id., 399.

Those cases also reveal, we think, why it is not necessary to apply the rule more stringently in murder cases than with regard to other crimes. Already, from the time of Perry's Case to that of the Boorns, social progress was such that Stephen Boorn was able to evade the gallows. The longer delay between conviction and execution in nineteenth century Vermont gave Stephen's attorneys a reasonable opportunity to investigate Colvin's disappearance after the condemned repudiated his earlier confession. At the same time, newspapers of mass circulation, such as the New York Evening Post, allowed for a broad and efficient search for the missing "victim."

Now consider modern Connecticut. The horrible that first inspired the rule—a disturbed individual executed after confessing to an imaginary murder—is no longer a concern following the repeal of the death penalty in this state. Although false conviction remains a tragic and ever present possibility, it is no longer a completely irreparable one.

State *v.* Leniart

Further, the technological tools that are now available to locate missing persons are truly impressive. When the Internet was still in its infancy, the United States Court of Appeals for the Third Circuit recognized that "[w]orldwide communication and travel today are so facile that a jury may properly take into account the unlikelihood that an absent person, in view of his health, habits, disposition and personal relationships would voluntarily flee, go underground, and remain out of touch with family and friends. The unlikelihood of such a voluntary disappearance is circumstantial evidence entitled to weight equal to that of bloodstains and concealment of evidence." (Internal quotation marks omitted.) *Virgin Islands* v. *Harris*, 938 F.2d 401, 418 (3d Cir. 1991). That statement is all the more true today, with new technologies running the gamut from "Amber Alerts," to biometric identification databases, to social media platforms such as Facebook and Twitter. See *McDuff* v. *State*, 939 S.W.2d 607, 623 (Tex. Crim. App.) ("it is less likely in today's mobile and technological society that a person might vanish and never be heard from again"), cert. denied, 522 U.S. 844, 118 S. Ct. 125, 139 L. Ed. 2d 75 (1997). That is not to say that people do not still go missing, sometimes for many years. With modern tools and expertise, however, many, if not most, are located quickly.[19] Accordingly, the abolition of the death penalty and the increasing unlikeliness that a living person will disappear without a trace for an extended period of time have mitigated the two most compelling rationales for retaining the traditional, more stringent corpus delicti rule solely with respect to murder prosecutions.

[19] M. Sullo, "Adult Missing Persons in Connecticut: Advocate Says Police Aren't Doing Enough," Middletown Press (December 18, 2011), available at https://www.middletownpress.com/news/article/Adult-missing-persons-in-Connecticut-Advocate-11876085.php (last visited September 4, 2019).

333 Conn. 88 SEPTEMBER, 2019 119

State *v.* Leniart

In addition, the same general considerations that have led courts and commentators[20] to question the ongoing vitality of the corpus delicti rule—mostly the fact that the *Miranda* warnings[21] and related constitutional protections have curtailed the use of coercive interrogation techniques by law enforcement—apply to murder no less than to other crimes. Those considerations counsel against carving out a special exception for murder.

Finally, we note that, unlike with many other crimes, in any murder prosecution there necessarily will be at least some modicum of extrinsic evidence to support a defendant's confession, namely, a missing person. We are not aware of, and we doubt that due process would permit, any prosecution charging the murder of a wholly unspecified victim. A person charged with murder must be charged with the murder of some specific victim who must, at the very least, have gone missing for some not insignificant period of time. Accordingly, we decline the defendant's invitation to carve out a special exception to the rule set forth in *State* v. *Harris*, supra, 215 Conn. 193–94, for the crime of murder.

2

We now turn our attention to the defendant's claim that the state failed to set forth sufficient evidence at trial to corroborate his alleged confessions and establish that the victim was, in fact, dead. As previously discussed, the corpus delicti rule, as most recently clarified by this court in *Harris* and *Hafford*, required that the state introduce "substantial independent evidence [that] tend[s] to establish the trustworthiness of the [defendant's] statement[s]." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Hafford*, supra,

___

[20] See, e.g., D. Moran, supra, 64 Ohio St. L.J. 818–19.

[21] See *Miranda* v. *Arizona*, 384 U.S. 436, 471–74, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

State *v.* Leniart

252 Conn. 316; see also R. Perkins, supra, 48 Va. L. Rev. 181 ("[prima facie] evidence is sufficient for this purpose, and there are indications in the direction of accepting even less than this" [footnote omitted]). The Appellate Court concluded, and we agree, that there was sufficient, independent corroborating evidence both to permit the trial court to allow the defendant's alleged confessions into evidence and, when considered in tandem with the various confessions, for the jury to find, beyond a reasonable doubt, that the defendant was guilty of the victim's murder. That evidence, which is more fully set forth in the opinion of the Appellate Court, may be briefly summarized as follows.

First, although it was not required under the rule that we have articulated today; see part I B 1 of this opinion; substantial circumstantial evidence was introduced at trial, wholly independent of the defendant's alleged confessions, tending to show that the victim died around the time of the alleged murder. The fifteen year old victim disappeared suddenly and without warning on May 29, 1996. She left home that night without taking any money, clothing, or personal belongings, despite the fact that nearly $1000 was available in the house. The jury also reasonably could have found, on the basis of the evidence presented at trial, that she enjoyed her family, friends, life, and routines in Montville and had no desire to run away from home or to commit suicide.

At the time of trial, she had been missing for more than thirteen years, without having made any known contact with family or friends, and a nationwide search had failed to locate her or to flag any use of her social security number.[22] See *Virgin Islands* v. *Harris*, supra,

_____

[22] We recognize that the record contains some troubling testimony and exhibits regarding James Butler, a former Marine and family friend of the victim, who claimed to have spoken with the victim at a video rental store in Virginia, some three years after her disappearance. However, Butler did not testify at trial, some questions were raised regarding his competence, and the police were unable to verify key elements of his story. Accordingly, and in light of the standard of review that governs this claim, we agree with

State *v.* Leniart

938 F.2d 417 (in murder cases in which body is never found, victim's failure to maintain habits and regular contact with family and friends is important extrinsic evidence of corpus delicti). In addition, Allain testified that, the day after the victim disappeared, he discovered her shoe on the wooded path where the defendant had taken him. All of this tended to support the conclusion that the victim had been murdered rather than running away from home.

In addition, aside from relating several of the defendant's alleged confessions, Allain provided other independent support for the conclusion that the victim had been killed. Allain testified that both he and the defendant had raped the victim on the evening in question, and that he had left the victim alone in the defendant's company. That testimony, if credited, established that the defendant already had assaulted the victim that night and that he had both the motive and the opportunity to kill her. See, e.g., *State* v. *Farnum*, supra, 275 Conn. 34 (evidence of motive deemed corroborative of confession).

Allain also testified that the defendant, prior to sexually assaulting the victim, had stated that he "wanted to do her" and that "we need a body." The corpus delicti rule generally does not apply so as to bar statements that an accused made prior to committing the alleged crime. See *Warszower* v. *United States*, 312 U.S. 342, 347, 61 S. Ct. 603, 85 L. Ed. 876 (1941); see also *State* v. *Farnum*, supra, 275 Conn. 35 (prior statement of intent to commit crime deemed corroborative of confession). At the same time, the defendant, when interviewed by the police, acted in a manner that could be interpreted as evidencing a consciousness of guilt, such as by questioning whether Allain had implicated him

the Appellate Court that we must assume that the jury declined to credit Butler's statement.

State *v.* Leniart

in the victim's disappearance and volunteering information to cast aspersions on Allain.

Moreover, at the time of trial, the defendant already had been convicted of sexually assaulting a thirteen year old girl. That victim testified in the present case that the defendant, six months prior to the victim's disappearance, had choked her into unconsciousness while raping her. She further testified that the defendant, after raping her in his trailer, threatened that, if she tried to leave, he would hunt her down, find her, and kill her. Where, as here, there is a question as to whether a crime has been committed and of the improbability of alternative, innocuous explanations for a loss, the fact that the accused has committed other, similar crimes may help to establish the corpus delicti of the charged offense. *United States* v. *Woods*, 484 F.2d 127, 136 (4th Cir. 1973), cert. denied, 415 U.S. 979, 94 S. Ct. 1566, 39 L. Ed. 2d 875 (1974); *Matthews* v. *Superior Court*, 201 Cal. App. 3d 385, 392, 247 Cal. Rptr. 226 (1988); see also Conn. Code Evid. § 4-5 (c) (evidence of other crimes admissible to demonstrate absence of accident and to corroborate crucial prosecution testimony).

Second, aside from this independent evidence that tends to establish that the victim was dead (and that the defendant was her killer), the Appellate Court identified various facts and factors that corroborate the defendant's inculpatory statements. See *State* v. *Leniart*, supra, 166 Conn. App. 170–74. Four different witnesses—Allain, Buckingham, Douton, and Ching—all testified that the defendant had admitted to them that he had killed the victim, or someone fitting her description, and disposed of her remains in a body of water.[23] Several

_____

[23] We caution that the mere fact that more than one witness testifies that the accused has confessed to a crime is not, by itself, sufficient corroboration to satisfy the corpus delicti rule. See *Wong Sun* v. *United States*, 371 U.S. 471, 489–90 n.15, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); see also *United States* v. *Northrup*, 482 F. Supp. 1032, 1037 (D. Nev. 1980) ("[i]f two admissions,

State *v.* Leniart

of these witnesses testified that the defendant claimed
to have disposed of the body in a lobster trap or fed
the victim's remains to crabs. That testimony is consis-
tent with the fact that the defendant was employed as
a lobster fisherman.

The jury may have found Ching's testimony to be
especially credible insofar as that witness was no longer
in prison, on probation or parole, and had no charges
pending against him when he came forward to relate the
defendant's confession to law enforcement. In addition,
the fact that the defendant's most significant and sub-
stantial confessions were volunteered to Allain, an
accomplice to the sexual assault of the victim, rather
than to an investigating officer, endows those confes-
sions with "a strong inference of reliability . . . ."[24]
(Internal quotation marks omitted.) *Kaneshiro* v.
*United States*, 445 F.2d 1266, 1270 (9th Cir.), cert.
denied, 404 U.S. 992, 92 S. Ct. 537, 30 L. Ed. 2d 543
(1971).

Finally, the defendant's ex-wife, Vicki Staplins, testi-
fied that, when she asked the defendant whether he
was involved in the victim's disappearance, "[h]e told
me the less I knew, the better off I was." The jury
reasonably may interpret statements of this sort as evi-
dence of the defendant's consciousness of guilt. See,

---

in and of themselves, are untrustworthy, obviously they cannot be boot-
strapped together to raise each other to the level of trustworthiness"); *State*
v. *Doucette*, supra, 147 Conn. 100 ("[e]ven two positive confessions of guilt,
without independent proof of the corpus delicti, would not be sufficient to
authorize a conviction" [internal quotation marks omitted]).

[24] We note that the corpus delicti rule, as applied in Connecticut, governs
confessions made to and reported by laypersons as well as law enforcement
officers. See *State* v. *Farnum*, supra, 275 Conn. 33 (applying rule where
defendant confessed crime to jailhouse informant); see also 1 K. Broun,
supra, § 145, pp. 807–808. This reflects the fact that false confessions may
result not only from the use of oppressive interrogation tactics by law
enforcement but also from other causes—mental illness, publicity seeking,
etc.—that may lead an individual to falsely confess to family, friends, cell-
mates, or even complete strangers.

State *v.* Leniart

e.g., *People* v. *Ortiz*, Docket No. B257413 (LDR), 2016
WL 1178972, *16 (Cal. App. March 25, 2016), review
denied, California Supreme Court, Docket No. S234113
(July 13, 2016).

Considered in the light most favorable to sustaining
the verdict, this evidence was more than sufficient to
corroborate the defendant's various confessions and,
when viewed in tandem with those confessions, to sus-
tain the conviction.

II

EXCLUSION OF PRETEST INTERVIEW VIDEOTAPE

We next consider the state's appeal, in which it claims
that the Appellate Court improperly held that the defen-
dant is entitled to a new trial because the trial court's
exclusion of Allain's polygraph pretest interview video-
tape constituted harmful error. The Appellate Court
concluded that (1) a recording of a polygraph pretest
interview does not qualify as "polygraph evidence" for
purposes of *State* v. *Porter*, 241 Conn. 57, 93–94, 698
A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct.
1384, 140 L. Ed. 2d 645 (1998) (holding that polygraph
evidence is per se inadmissible for all purposes in all
trial court proceedings), and (2) the trial court's exclu-
sion of the videotape pursuant to *Porter* was not harm-
less error. *State* v. *Leniart*, supra, 166 Conn. App. 182.
The state challenges both of those conclusions on
appeal. Although we agree with the Appellate Court
that polygraph pretest interview evidence is not per se
inadmissible under *Porter* and, therefore, that the video
was improperly excluded on that basis, we conclude
that any error in the exclusion of the video was harm-
less.

We begin by briefly summarizing the procedural his-
tory relevant to this issue, which was set forth in full
by the Appellate Court. Prior to trial, the state filed a

State *v.* Leniart

motion in limine seeking to exclude all testimony or evidence pertaining to the polygraph examination of any witnesses. Defense counsel opposed the motion, arguing that he intended to offer, among other things, a ninety minute videotape showing the standard pretest interview that the polygrapher, state police Trooper Tim Madden, had conducted with Allain prior to performing Allain's polygraph test in 2004. Defense counsel stated that he would seek to offer the videotape on the ground that it showed Madden giving Allain numerous assurances that Allain would receive favorable treatment if he cooperated with the police, which, defense counsel argued, "raises questions . . . about whether this young man is coming into this courtroom with the intention to do anything other than save himself."

The trial court ruled that the videotape was inadmissible. The court's oral ruling appeared to adopt the state's argument that a recording of a pretest interview or, indeed, any reference to the fact that a polygraph examination has been conducted, constitutes polygraph evidence and is, therefore, per se inadmissible. The court did, however, indicate that it would permit defense counsel to cross-examine Allain regarding "any promises or benefits that were made to him during the course of that interview."

A

We first consider whether the trial court properly determined that the videotape of Allain's pretest interview was not admissible for any purpose because it constituted "polygraph evidence," which we have held to be per se inadmissible. See *State* v. *Porter*, supra, 241 Conn. 93–94. This presents a question of law that we review de novo. See, e.g., *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007).

In granting the state's motion in limine to exclude the pretest interview videotape, the trial court relied

State *v.* Leniart

solely on *Porter*, concluding that the videotape constituted polygraph evidence. Accordingly, we shall confine our analysis to the question of whether the per se ban on the admission of polygraph evidence articulated in *Porter* extends to evidence of the conduct of the polygrapher and the witness during the pretest interview process.

The Appellate Court concluded, and we agree, that the phrase "polygraph evidence," as used in *Porter*, does not encompass documentation of the pretest interview process. *State* v. *Leniart*, supra, 166 Conn. App. 182. As the Appellate Court recognized, the question before this court in *Porter* simply was whether we should abandon the existing rule regarding the inadmissibility of (1) the *results* of polygraph tests and (2) the willingness of a witness to submit to such a test. Id., 190–91. In *Porter*, we characterized that rule as follows: "This court has repeatedly held that neither the results of a polygraph test nor the willingness of a witness to take such a test is admissible in Connecticut courts." (Internal quotation marks omitted.) *State* v. *Porter*, supra, 241 Conn. 93. Thus, our holding in *Porter* was limited to barring the results of a polygraph test and the willingness of a witness to undergo such a test.

We also are not persuaded by the state's argument that, because the pretest interview is an integral component of a polygraph examination, evidence of what transpired during the interview must be subject to the same per se rule as are examination results. Rather, we agree with the Appellate Court that we used the term "polygraph evidence" narrowly in *Porter*, as a shorthand reference only to the specific types of evidence the admission of which was at issue in that case, namely, evidence showing test results and a witness' willingness to submit to a polygraph test.

Thus, we agree with the Appellate Court that polygraph pretest interview evidence does not constitute

State *v.* Leniart

"polygraph evidence" for purposes of *Porter* and is not, therefore, per se inadmissible. Accordingly, it was for the trial court, in the exercise of its discretion and in light of the facts of this particular case, to determine whether admission of part of Allain's pretest interview would have been more probative than prejudicial. To the extent that the trial court failed to make such a determination, exclusion of the entire videotape was improper.

B

Having concluded that the trial court incorrectly determined that the videotape of Allain's pretest interview constituted inadmissible polygraph evidence, we must consider whether the Appellate Court correctly concluded that that error was harmful.[25] The Appellate Court recognized that, during his cross-examination of Allain, defense counsel was able to establish both that Allain had powerful incentives to cooperate with the state in implicating the defendant and that Allain had changed or augmented various aspects of his story on a number of occasions. *State* v. *Leniart,* supra, 166 Conn. App. 195–96. Nevertheless, the Appellate Court found that the failure to admit the videotape substantially affected the verdict because (1) the videotape would have provided more direct evidence of Allain's motive and bias to implicate the defendant, including "the subtle but significant pressure placed on Allain by law enforcement," and (2) the jury was deprived of the opportunity to understand that the pretest interview was conducted in the context of a polygraph examination, which was significant to the defendant's claim. Id., 196–97. Although it is a close call, we are not persuaded that the defendant has met his burden of demon-

[25] Because we conclude that exclusion of the videotape was not harmful error, we need not address the state's alternative argument that the trial court also made a reasonable, discretionary determination that the prejudicial impact of the videotape outweighed its probative value.

State *v.* Leniart

strating that exclusion of the videotape substantially affected the verdict.

1

We begin by setting forth the well established standards that guide our review. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 311 Conn. 80, 89, 83 A.3d 595 (2014).

2

The following additional facts and procedural history are relevant to this issue. Madden's pretest interview of Allain lasted for approximately ninety minutes. For the first thirteen minutes or so, Madden and Allain discussed Allain's reasons for submitting to the polygraph. Specifically, a question arose as to whether Allain was taking the test voluntarily, because he believed that assisting the state was the right thing to do or, rather, because he was facing a potential five year sentence for having violated his probation through a failed drug test and had been led to believe that the state might not pursue a conviction if he cooperated in this matter. Allain initially indicated that he had consented to the polygraph primarily to avoid the conviction for violating his probation. Madden promptly explained, in no uncertain terms, that he could not perform the polygraph on those terms. Thus, before proceeding, Madden obtained from Allain a statement that he was participating freely.

The remainder of the pretest interview consisted of Madden's asking Allain a series of background questions, reviewing the statements that Allain had given to the police and Allain's accounts of the events sur-

State *v.* Leniart

rounding the victim's disappearance, and explaining the questions that Allain would be asked during the polygraph. During that time, Madden repeatedly emphasized how "unbelievably important" it was for Allain to give completely truthful answers during the examination.

Moreover, Madden consistently equated truthfulness with successfully passing the test, doing "the right thing," and being a reliable witness. He emphasized in this respect that the state would consider Allain to be a useful witness, and Allain would qualify for potentially favorable treatment, only if the polygraph results demonstrated that Allain was being completely truthful and forthcoming. Madden referred several times during the interview to the investigation of the 1997 gang rape and murder of Maryann Measles. He informed Allain that suspected participants in that crime who *truthfully* confessed their roles and then passed polygraph examinations were let off with "a slap on the wrist," whereas suspected participants who failed polygraph tests were aggressively prosecuted.

At several points during the interview, Madden made comments indicating that the police were interested in obtaining Allain's cooperation. In particular, Madden explained that the police were interested in having Allain on their "team" rather than on the defendant's team, and in procuring Allain's assistance in "getting" the defendant, whom Madden described as the "bigger fish." In each instance, however, he made clear that Allain could provide such assistance only by giving completely truthful testimony and passing the polygraph test. Madden indicated, for example, that, if Allain failed the polygraph, then he would be on the "other team," aligned with the defendant, rather than "on our team." In other words, Madden made clear that only truthful statements would help Allain.

Throughout the interview, Madden made comments that gave the impression that he believed that Allain

State *v.* Leniart

had not been completely forthcoming in his prior statements to the police and that Allain still had something to "get off [his] chest." In a few instances, Madden speculated that Allain felt intimidated or frightened by the defendant. In most instances, however, Madden appeared to believe that what Allain was withholding was the extent of his own involvement in the crime. Madden even suggested that this might be a cause of Allain's diagnosed clinical depression and speculated that Allain, by telling the complete truth, might find some relief. It is clear to us, then, that introduction of the videotape into evidence would not have significantly weakened the state's case. See *State* v. *Rodriguez*, supra, 311 Conn. 89 (import of excluded evidence was important factor in assessing harmlessness).

After the trial court ruled the videotape inadmissible, the state called Allain to testify. The prosecutor began his direct examination by eliciting that Allain was then serving a ten year sentence for felony sexual assault involving a different victim, and that Allain was hoping for "leniency" in connection with that sentence in exchange for his cooperation with the state and testimony against the defendant in the present matter. Allain acknowledged that "it would be nice" to receive some consideration in exchange for his testimony.

On cross-examination, defense counsel effectively developed all of the basic facts and themes that the defendant sought to establish through use of the pretest interview videotape. Defense counsel was able to demonstrate that Allain was generally unreliable as a witness. For example, defense counsel repeatedly returned to the theme that Allain had two powerful incentives to cooperate with the state in convicting the defendant, namely, to divert attention from himself as a suspect in the victim's murder and to obtain a reduction of the sentence that he was then serving for sexual assault. With respect to the former, Allain admitted to having

State *v.* Leniart

raped the victim on the night she disappeared and to having concealed that information from the police until after the statute of limitations for rape had expired. He also understood, however, that the statute of limitations for a felony murder never runs.

Allain also acknowledged that he had found and concealed the victim's shoe the day after she disappeared, and that this could make him an accessory to her murder. He also admitted to telling the police that he had previously indicated to the defendant that he was willing to kill the victim, and that he later told his father that he was involved in the victim's murder and that he needed help moving her body.[26] Allain admitted that he was concerned because, if the police believed that he had anything to do with the victim's death, he still could be charged with capital felony, and he believed that he would face a likely death sentence if convicted. At the same time, Allain, without expressly mentioning the pretest interview, testified that Madden had repeatedly told him that even someone who had been involved in rape and murder "could walk away . . . with a slap on the hand" if they cooperated with the police.[27] Accordingly, the jury was aware that Allain was a potential suspect in the victim's murder, that he had implicated himself in the murder, and that he understood that he could be charged with the crime if the defendant were exonerated.

The jury also heard testimony suggesting that there was an implicit agreement between Allain and the state that he would receive leniency on his sexual assault sentence if he fully cooperated with the state in this matter and if his cooperation proved sufficiently help-

_____

[26] Allain had previously repudiated that confession during his direct examination.

[27] Allain initially testified that he did not recall discussing that subject with Madden but ultimately acknowledged that, although he could not remember exactly what Madden had said, he did recall the discussion.

State *v.* Leniart

ful. Allain twice acknowledged that, at the time he was sentenced on that conviction, the state's attorney had indicated that the state would not oppose a motion for sentence modification at a later date if Allain met certain unstated requirements. Allain testified that he understood that to mean that he might be allowed to serve less time if he "played ball" and cooperated in the defendant's case.

At several points, Allain expressed hope that the state would believe that he had provided substantial assistance in the case against the defendant and that, if his cooperation was sufficiently valuable, he would be released from prison early. Indeed, Allain complained that he had been "blackmailed" by the state and that an especially long sentence had been imposed for the sexual assault conviction specifically to ensure that he assisted the state in the defendant's case.

Accordingly, the jury learned through cross-examination that Allain felt pressured to cooperate and that he hoped that the state would deem his help sufficiently valuable that he would obtain a sentence modification. See *State* v. *Rodriguez*, supra, 311 Conn. 89 (opportunity to bring out content of excluded evidence on cross-examination was important factor in assessing harmlessness). Even though all of the basic facts and themes that the defendant sought to show to the jury through the pretest interview videotape were effectively elicited during Allain's cross-examination, the Appellate Court concluded that the defendant had met his burden of proving that exclusion of the videotape had substantially affected the verdict. *State* v. *Leniart*, supra, 166 Conn. App. 197.

3

The conclusion of the Appellate Court was based on the dual determinations that (1) viewing the videotape would have given the jury a more direct and persuasive

State *v.* Leniart

impression of Allain's bias and motives, and of the pressures he was under to implicate the defendant, than could have come out through during cross-examination, and (2) the fact that the interview took place in the specific context of a polygraph examination was critically important to the ability of the jury to assess the credibility of the state's key witness. Id., 196–97. We consider each point in turn.

a

Our analysis is guided by the principle that "[t]he credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the witness to testify falsely." Conn. Code Evid. § 6-5. "Because evidence tending to show a witness' bias, prejudice or interest is never collateral . . . impeachment of a witness on these matters may be accomplished through the introduction of extrinsic evidence, in addition to examining the witness directly." (Citation omitted.) Conn. Code Evid. § 6-5, commentary. "However, otherwise [r]elevant [impeachment] evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Brown*, 273 Conn. 330, 342, 869 A.2d 1224 (2005); see also Conn. Code Evid. § 4-3.

Our impression of the videotape, and what the jury likely would have gleaned therefrom, differs from that of the Appellate Court. It is true that the first portion of the pretest interview does not cast the polygrapher in an especially favorable light. One could view the videotape and conclude that Madden disregarded Allain's clear statement that he believed that he was being coerced into taking the polygraph test, and that

State *v.* Leniart

Madden coaxed Allain into saying the magic words that would allow the interview to proceed while permitting Allain to obtain the benefits that he sought.

Equally apparent, though, is the diligence with which Madden conducted the remainder of the interview. At the outset, having ascertained that Allain suffers from depression, Madden offered Allain numerous opportunities to terminate the interview if Allain believed that it might exacerbate his condition. More importantly, although Madden repeatedly encouraged Allain to cooperate with the state, cooperation was never framed in terms of implicating the defendant, inventing stories, or testifying *falsely* for the state. Rather, Madden repeatedly, consistently, and expressly instructed Allain that cooperation consists of *telling the truth*. In fact, on more than one dozen occasions, Madden emphasized to Allain the importance of telling the complete truth and that only truthful testimony would be of assistance to the state or advantageous to Allain. Likewise, two other officers who briefly questioned Allain during the interview encouraged Allain to be completely truthful, at one point telling him that "we don't want you to tell us what you think we want to hear."

Although this point is not discussed in the Appellate Court opinion, it is critically important. Although Allain's motivation for *participating* in the state's investigation and prosecution of the defendant may have been of some interest to the jury, jurors' primary concern must have been his veracity—whether he had been pressured or induced to fabricate his account of the defendant's confessions. Allain's trial testimony itself provided the strongest evidence that he might have reason not only to cooperate with the state but also to actively help the state to convict the defendant. During cross-examination, for example, Allain conceded that he hoped "that the state believes that [he] provided substantial assistance in [its] case against [the defen-

State *v.* Leniart

dant] . . . .'' He also expressed his hope that ''the state agrees that [his] cooperation in this case was valuable enough'' to obtain a sentence modification.

By contrast, even defense counsel, in arguing to the trial court the importance of the videotape, emphasized that the polygrapher's primary focus was to encourage Allain to testify truthfully: ''Insofar as this witness was taken, isolated for a period of ninety minutes, badgered in my view into being told about all the benefits of cooperation, *about the need to be truthful*, about everything he stood to gain up to and including a potential walk—that . . . rate[s] a powerful argument that this young man may have been promised more than a year or two off *if he tells the truth*.'' (Emphasis added.)

For this reason, we disagree with the Appellate Court that the videotape provided the most compelling evidence that Allain had an undisclosed bias against or motive to implicate the defendant. At trial, Allain himself freely admitted that he had powerful incentives to cooperate with the state and to assist in convicting the defendant. If anything, the videotape, with its constant emphasis on the importance of truthfulness, undercuts that narrative. The themes that the Appellate Court found most troubling—Madden's desire to keep Allain on his team so as to catch ''the big fish''—are embodied in just a few brief comments made in the course of a ninety minute interview, all of which are expressly linked to the ''unbelievably important'' need for Allain to be completely truthful.

We also do not share the Appellate Court's concern that ''the jury could reasonably conclude from the videotape that Madden attempted to shape Allain's story about the defendant's actions on May 29, 1996, in order to make it more plausible.'' *State* v. *Leniart*, supra, 166 Conn. App. 195. It is true that, during the pretest interview, Madden and the other officers pointed out

State *v.* Leniart

a few aspects of the defendant's story that they found
difficult to believe. They found Allain's story implausi-
ble, for example, on the point that the victim had not
said anything at all when the defendant approached
and began having sex with her. Also, after Allain
amended his statement to include the fact that he had
found and disposed of the victim's shoe before meeting
with the defendant on the day after the assaults, the
officers questioned whether that discovery would not
have altered the tone of the ensuing conversation with
the defendant as Allain initially had reported it. We
have not identified any instance, however, in which it
appeared that Madden or other officers were attempting
to help Allain to more plausibly implicate the defendant.
Rather, the clear subtext to the entire interview was
that Madden believed that Allain had not come clean
with respect to his own role in the victim's murder.[28]

b

We also do not share the Appellate Court's concern
that cross-examination in this case was an inadequate
substitute for the videotape. The Appellate Court took
issue with the fact that, although the jury was able to
learn some of what had transpired during the interview
and was made aware of Allain's incentives to falsely
implicate the defendant, the jury was not informed that
these events occurred in the specific context of a poly-
graph examination. *State* v. *Leniart*, supra, 166 Conn.
App. 196.

Although the Appellate Court frames the importance
of the videotape in terms of having occurred in the
context of a polygraph examination, the court's expla-

---

[28] Prior to asking Allain to review and verify his prior statements to the
police, for example, Madden instructed him as follows: "[L]et's assume worst
case scenario, worst case scenario you go look, [the defendant] was choking
her and I was holding her feet. Not only did I witness him kill her, I helped
restrain her. . . . [A]s long as it comes out prior to, you're going to pass
the polygraph."

State *v.* Leniart

nation primarily addresses the content of the videotape rather than the context. But, as we already have discussed, the handful of potentially troubling statements that the Appellate Court highlights were made by Madden over the course of a ninety minute interview in which he consistently emphasized that Allain would be of assistance to the state, and eligible for the benefits attendant to that assistance, only if he were completely truthful. Moreover, all of Madden's statements to that effect either were, or could have been, elicited by defense counsel on cross-examination.

Unlike the Appellate Court, we fail to see the significance of the fact that the pretest interview took place in the specific context of a polygraph examination. If anything, that context would appear to undermine the defendant's position. At the time of the polygraph, Allain already had implicated the defendant in the victim's murder on several occasions. Madden's clear purpose in the interview was not to encourage Allain to implicate the defendant, which he already had done, but, rather, to impress on Allain the importance of fully disclosing all details, including his *own* role in the victim's disappearance. Madden repeatedly indicated that the state would be able to depend on Allain's credibility as a witness only if Allain was completely forthcoming during the polygraph test. Accordingly, we do not think the jury reasonably could have gleaned from the videotape that the police were pressuring or incentivizing Allain either to falsely implicate the defendant in the victim's murder or to hew to the inculpatory statements that he previously had given.

To summarize, all of the themes that the defendant sought to develop by way of the videotape were adequately brought out during cross-examination and, if anything, viewing the videotape in context would have undermined the defendant's theory that Allain had been pressured to implicate the defendant falsely. See *State*

State *v.* Leniart

v. *Rodriguez*, supra, 311 Conn. 89 (likely impact on jury is central factor in assessing harmlessness). We further emphasize that, despite the lack of a body, the state's case against the defendant was strong, as it involved four independent witnesses who testified that the defendant had admitted to killing the victim. See id. We therefore conclude that any error by the trial court in excluding the pretest interview videotape was harmless.

III

EXCLUSION OF EXPERT TESTIMONY

We next consider whether the Appellate Court correctly concluded that the trial court had abused its discretion in precluding the testimony of Alexandra Natapoff, a law professor whom the defendant offered as an expert on the use, and questionable credibility, of incarcerated informants as witnesses in criminal prosecutions. The state contends, and we agree, that the trial court did not abuse its discretion when it determined that Natapoff's testimony would not have assisted the jury in this case. We therefore conclude that the Appellate Court incorrectly determined that the trial court had abused its discretion in precluding that testimony.

A

The following procedural history is relevant to this issue. Prior to trial, the state filed a motion in limine seeking to preclude Natapoff's testimony. The state argued that expert testimony regarding the dubious credibility of jailhouse informants would (1) address matters within the common knowledge of the jury, (2) be more prejudicial than probative, and (3) invade a core function of the jury, namely, assessing the credibility of witnesses. At trial, the state renewed its objection,

State *v.* Leniart

and Natapoff proffered the testimony outside the presence of the jury.

After establishing her bona fides as an expert on the subject of jailhouse informants,[29] Natapoff testified that the use of such informants in criminal prosecutions is pervasive, with prosecutors and the police offering, and inmates seeking, an array of benefits in exchange for incriminating testimony. She explained that the informant testimony acquired in this "marketplace" is "sometimes" untruthful and, in fact, is a significant source of wrongful convictions. Natapoff further testified that informants can be quite "entrepreneurial," using various methods to obtain information about another inmate's case and to fabricate believable, incriminating stories. For example, inmates may rely on jailhouse gossip, steal files from other inmates, obtain case information from newspapers and media reports, or simply cooperate with other inmates to invent and validate each other's stories. Natapoff also expressed doubts as to whether the usual methods used to instruct and warn juries to be cautious about informant testimony are effective in preventing false convictions arising from the use of criminal informants.

Natapoff further described the marketplace for jailhouse informant testimony as "secretive" and testified that the public learns little about how the criminal justice system uses informants. She opined that the public is not familiar with jailhouse culture and is unaware of how infrequently dishonest informants are prosecuted for perjury. She also acknowledged, however, that several magazines have done exposés on the abuses associated with the use of jailhouse informants and that the practice is now well understood "outside" of correctional facilities.

[29] The state does not dispute that Natapoff qualifies as an expert on these matters.

State *v.* Leniart

On cross-examination, Natapoff conceded that studies regarding the use of jailhouse informants are largely limited to capital cases and that, even in those cases, it is impossible to know how many wrongful convictions have occurred as a result. The most she could say by way of quantification is that estimates of the share of wrongful convictions in capital cases range from 1 to 10 percent and that informant testimony was a factor in 20 to 45 percent of those cases—so between 0.2 and 4.5 percent of all capital convictions. She also described one study that concluded that criminal informant testimony was responsible for approximately 20 percent of all wrongful convictions in California. Natapoff acknowledged, however, that the problems associated with criminal informant testimony are not uniform throughout the country and that she had not studied Connecticut and was not aware of any particular customs and practices in Connecticut or, specifically, in New London. At no time did she opine as to what percentage of criminal informants testify untruthfully, either in Connecticut or elsewhere.

Natapoff further conceded that she had never testified before a jury. In fact, she was aware of only two cases in the country in which experts had been permitted to testify regarding the use of criminal informants, one in Wyoming and one in Louisiana. Moreover, although she wrote a book on the subject of criminal informants in which she offered various proposals for reforming the system and preventing the abuses associated with dishonest informants, Natapoff admitted that she had not recommended the use of expert testimony as a prophylaxis. She also could not say whether stricter regulation of the use of criminal informants had reduced the number of wrongful convictions in Los Angeles, a city that is closely associated with the use and abuse of jailhouse informant testimony.

State *v.* Leniart

After permitting additional argument by the parties, the trial court granted the state's motion in limine and precluded Natapoff's testimony. The court articulated three rationales for its decision.

First, the trial court concluded that allowing testimony as to the credibility of jailhouse informants would be improper because credibility determinations are within the exclusive province of the jury. Second, the court found that, although Natapoff referenced certain research about which the jury might not be aware, her central conclusions—the marketplace for information and informants' incentives to testify falsely—were not outside the ken of the average juror. Third, the court emphasized that it had given the defense wide latitude in cross-examining the state's witnesses regarding any consideration they might receive for their testimony and that it intended to instruct the jury regarding the credibility of incarcerated witnesses in accordance with *State* v. *Arroyo*, 292 Conn. 558, 569, 973 A.2d 1254 (2009) (jailhouse informant testimony is inherently suspect and warrants special jury instruction), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010).[30] The Appellate Court, unpersuaded by these rationales, reversed. That court held that "expert testimony concerning the reliability of informant testimony should be admitted if the court . . . determines that the expert is qualified and the proffered testimony is relevant to the specific issues in the case." *State* v. *Leniart*, supra, 166 Conn. App. 212.

[30] Shortly after the trial court's ruling in this case, this court decided *State* v. *Guilbert*, 306 Conn. 218, 257–58, 49 A.3d 705 (2012), in which we held that, although expert testimony on the reliability of eyewitness identifications is presumptively admissible where relevant and directly applicable to the facts and circumstances of a case, a court does not abuse its discretion in precluding such testimony if cross-examination and focused, informative jury instructions provide an adequate substitute. We express no opinion as to whether the rule articulated in *Guilbert* should apply to expert testimony regarding the reliability of jailhouse informants.

State *v.* Leniart

## B

We begin by setting forth the well established legal principles that govern this claim. "The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law. . . . Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Taylor G.*, 315 Conn. 734, 760, 110 A.3d 338 (2015); see also Conn. Code Evid. § 7-2. "It is well settled that [t]he true test of the admissibility of [expert] testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter; but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue. . . . Implicit in this standard is the requirement . . . that the expert's knowledge or experience . . . be directly applicable to the matter specifically in issue." (Internal quotation marks omitted.) *State* v. *Guilbert*, 306 Conn. 218, 230, 49 A.3d 705 (2012).

We also have explained that "[t]he determination of the credibility of a witness is solely the function of the jury. . . . It is the trier of fact [that] determines the credibility of witnesses and the weight to be accorded their testimony. . . . Expert witnesses cannot be permitted to invade the province of the jury by testifying as to the credibility of a particular witness or the truthfulness of a particular witness' claims." (Internal quotation marks omitted.) *State* v. *Taylor G.*, supra, 315 Conn. 760–61.

State *v.* Leniart

C

As previously noted, the trial court precluded Nata-poff's testimony on several different grounds. We agree with the Appellate Court that the trial court incorrectly concluded that Natapoff's testimony would have invaded the exclusive province of the jury by assessing the credibility of the state's witnesses. *State* v. *Leniart,* supra, 166 Conn. App. 224. We do not agree, however, that the trial court abused its discretion in concluding that that Natapoff's testimony was largely within the ken of the jurors. Id., 227–28.

1

We have had a number of opportunities to consider whether the admission of expert testimony as to the credibility and tendencies of a certain class of witnesses would improperly usurp the role of the jury. See, e.g., *State* v. *Taylor G.*, supra, 315 Conn. 734 (minor victims of sexual abuse); *State* v. *Favoccia*, 306 Conn. 770, 51 A.3d 1002 (2012) (same); *State* v. *Guilbert*, supra, 306 Conn. 218 (eyewitnesses to crime); *State* v. *Ali*, 233 Conn. 403, 660 A.2d 337 (1995) (female victims of sexual assault); *State* v. *Borrelli*, 227 Conn. 153, 629 A.2d 1105 (1993) (battered women syndrome). In those cases, we have drawn a critical distinction between expert testimony that merely explains the behaviors or underlying neuropsychology typical of the class of witnesses at issue, and testimony that applies that knowledge so as to pass judgment—directly or indirectly—on the veracity of particular witnesses. We consistently have held that, although the former type of testimony is admissible if the trial court concludes that it otherwise satisfies the standards for expert testimony; see part III B of this opinion; testimony that speaks to the credibility of specific witnesses typically is inadmissible insofar as it invades the exclusive province of the jury. See, e.g., *State* v. *Taylor G.*, supra, 761–65; *State* v. *Favoccia,*

State *v.* Leniart

supra, 787–90; *State* v. *Ali*, supra, 432–33; *State* v. *Borrelli*, supra, 173–74; *State* v. *Spigarolo*, 210 Conn. 359, 378–79, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). Accordingly, although the jury is free to apply an expert's generic testimony about a class of witnesses to the specific witnesses who testify in a particular case, an expert may not connect those dots for the jury.

In the present case, Natapoff intended to testify only with respect to the general characteristics of the marketplace for criminal informant testimony and the academic research indicating that unreliable informant testimony contributes to many wrongful convictions. During argument on the state's motion, defense counsel represented to the trial court that Natapoff had no knowledge about this particular case and that she was not familiar with, and did not intend to comment on, the testimony of any of the state's witnesses. Expert testimony about the behavior of jailhouse informants as a class is not per se inadmissible.[31] For this reason, we agree with the Appellate Court that the trial court incorrectly concluded that Natapoff's testimony would have invaded the province of the jury. *State* v. *Leniart*, supra, 166 Conn. App. 222–24.

2

We next consider whether the trial court abused its discretion when it determined that Natapoff's primary conclusions were not of assistance to the jury. We have explained that expert testimony is required only when a disputed matter is "*manifestly* beyond the ken of the average trier of fact, be it judge or jury." (Emphasis

---

[31] Although we conclude in part III C 2 of this opinion that, to the extent that Natapoff's testimony was directly applicable to the present case, it was not beyond the ken of the average juror, we do not foreclose the possibility that testimony on the practices and procedures governing criminal informant testimony in Connecticut could be presumptively admissible under other circumstances.

State *v.* Leniart

added.) *State* v. *McClary*, 207 Conn. 233, 245, 541 A.2d 96 (1988). At the other extreme, ''[w]hen inferences or conclusions are so obvious that they could be as easily drawn by the jury as the expert from the evidence, expert testimony regarding such inferences is inadmissible.'' *State* v. *Iban C.*, 275 Conn. 624, 639, 881 A.2d 1005 (2005). It also is well established that expert testimony should be admitted only when the expert's knowledge or experience is directly applicable to a matter specifically at issue. *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 159, 971 A.2d 676 (2009); see also Conn. Code Evid. § 7-2.

We are not aware of any studies supporting Natapoff's testimony that the typical juror may not be familiar with the full scope of the marketplace for jailhouse informant testimony, the specific means by which inmates can fabricate believable incriminating stories, the panoply of incentives that the state is able to offer in exchange for such testimony, and the lack of any meaningful deterrent for an inmate who is willing to commit perjury. However, even if we were to assume, for the sake of argument, that Natapoff is correct that the typical juror is not aware of the full spectrum of risks that attend to the use of jailhouse informants, we would conclude for the following three reasons that the trial court did not abuse its discretion in precluding her testimony.

First, the trial court was free to credit Natapoff's own testimony that, although jurors may not be familiar with all of the nuances of the academic research in this field, the fundamental concerns regarding the reliability of criminal informant testimony have been exposed by the media and are well understood outside of the jailhouse. Natapoff's testimony in this regard is consistent with our own understanding of the issue. Although we disagree with the Appellate Court that the state was obliged to provide ''empirical studies'' to demonstrate

State *v.* Leniart

that Natapoff's opinions are within the knowledge of the average layperson; *State* v. *Leniart*, supra, 166 Conn. App. 224; we observe that the potential abuses associated with jailhouse informant testimony have been explored by investigative journalists and are generally engrained throughout the popular culture.[32]

Indeed, one federal court facing a similar question recently cited to the Appellate Court's decision in this case, finding it unpersuasive for precisely this reason. See *United States* v. *Noze*, 255 F. Supp. 3d 352, 354 (D. Conn. 2017), aff'd sub nom. *United States* v. *Dugue*, 763 Fed. Appx. 93 (2d Cir. 2019). In that case, the defendants proposed to call an expert who, like Natapoff, would have testified as to the questionable credibility of cooperating witnesses. Id., 353. Judge Jeffrey A. Meyer explained that he was unpersuaded by the Appellate Court's reasoning because, among other things, "I think juries already understand that jails are miserable places. Juries understand that cooperating witnesses have committed crimes and have powerful motives to say what they can to stay out of or to be released from jail. I am not convinced that juries need a law professor to teach them more about the 'true culture of jails.' " Id., 354; see also *State* v. *Woods*, Docket No. C-130413 (LHH), 2014 WL 4437733, *7 (Ohio App. September 10, 2014) (testimony was not beyond knowledge of jury), appeal

---

[32] See, e.g., N. Yarris, The Fear of 13 (Arrow Books 2017) c.4; 60 Minutes: Informant Says He Was Planted in Orange County Jail To Snitch (CBS television broadcast May 21, 2017), available at https://www.cbsnews.com/news/informant-says-he-was-planted-in-orange-county-jail-to-snitch (last visited September 4, 2019); Frontline: Snitch, How Informants Have Become a Key Part of Prosecutorial Strategy in the Drug War (PBS television broadcast January 12, 1999), available at https://www.pbs.org/wgbh/pages/frontline/shows/snitch/etc/script.html (last visited September 4, 2019); G. Cothran, "Trial by Liar," SF Weekly, January 14, 1998, available at https://www.sfweekly.com/news/trial-by-liar (last visited September 4, 2019); R. Reinhold, "California Shaken over an Informer: He Shows How To Fabricate a Prisoner's Confession," N.Y. Times, February 17, 1989, pp. A1, A17; see also *Goldstein* v. *Long Beach*, 715 F.3d 750, 758 (9th Cir. 2013) (referencing 60 Minutes broadcast from 1988).

State *v.* Leniart

denied, 142 Ohio St. 3d 1422, 28 N.E.3d 121, cert. denied
U.S.     , 136 S. Ct. 420, 193 L. Ed. 2d 329 (2015).

Second, and perhaps more significantly, the defendant's proffer failed to establish that any of the specific information of which the jury might not have been aware is directly applicable to the present case. Unlike in cases such as *State* v. *Guilbert*, supra, 306 Conn. 226–27, in which the expert testimony at issue addressed neuropsychological traits that can be expected to apply to most, if not all, individuals, Natapoff's testimony hinged to a significant extent on research into the practices that are common to certain correctional facilities and the procedures that are used by certain prosecutor's offices in states such as California. Natapoff readily conceded that these practices and procedures are not uniform throughout the country and, further, that she had not studied whether and to what extent they are present in Connecticut. She was unable to say, for example, whether there is a significant possibility that an informant who lies under oath in a Connecticut trial will be prosecuted for perjury; nor could she speak to the specific benefits that the witnesses in this action might reasonably have expected to receive.

Moreover, in the cases in which we have allowed experts to testify as to the credibility of a class of witnesses, the experts did not merely testify that certain witnesses are, generally, of dubious credibility. Rather, the experts provided the jury with a useful template, describing patterns of behavior typical of such witnesses so that jurors could better assess whether particular conduct or statements demonstrated veracity or mendacity. In *Guilbert*, for instance, the state's expert presented various factors that jurors could use to assess the accuracy of an eyewitness identification: the degree of stress to which the witness was exposed, the witness' prior familiarity with the person, "the length of time during which the eyewitness was able to observe the

State *v.* Leniart

person, lighting, distance, and whether the eyewitness was paying attention.'' *State* v. *Guilbert*, supra, 306 Conn. 227.

Similarly, in our cases addressing the credibility of victims of domestic abuse, experts explained how such victims tend to delay reporting to the police, recant or provide inconsistent accounts of the abuse, and feel powerless to leave an abusive relationship. See, e.g., *State* v. *Taylor G.*, supra, 315 Conn. 755; *State* v. *Ali*, supra, 233 Conn. 429; *State* v. *Borrelli*, supra, 227 Conn. 167–70. In several instances, we emphasized that the defense had tried to impeach the complaining witness by highlighting delayed or inconsistent reporting of the alleged crime and that expert testimony was needed to rebut those arguments and to help jurors understand how conduct that might otherwise be thought to undermine a complainant's credibility is actually typical of victims of such crimes. See, e.g., *State* v. *Ali*, supra, 433; *State* v. *Borrelli*, supra, 170; *State* v. *Spigarolo*, supra, 210 Conn. 377.

In the present case, by contrast, Natapoff did not provide any template by which jurors could evaluate the testimony of jailhouse informants. She opined that some informants testify truthfully and others do not but did not offer any practical guidance as to how a jury might distinguish the former from the latter.

One could imagine a case in which Natapoff's testimony might prove helpful to a jury. If, for example, an informant witness claimed that a defendant had revealed details about a crime that would appear to be knowable only by the perpetrator, then learning that inmates often glean such information by reading their cellmates' legal files or from outside sources could be illuminating. Importantly, however, there is no suggestion in the present case that the state's witnesses testified as to any details of the crime that, while appearing to be knowable only by the perpetrator, could in fact

State *v.* Leniart

have been obtained via media reports or other means. Rather, Allain's statements and testimony were the only source of detailed information about the alleged crime, and he obtained that information from the defendant at the time of the murder, rather than during his later incarceration.[33] Moreover, as the defendant himself emphasizes, the testimony of Buckingham, Ching, and Douton, while confirming the general outlines of Allain's account, differed with respect to certain details of the alleged crime.

Ultimately, then, all a jury reasonably could glean from Natapoff's testimony is that it should be especially skeptical of any jailhouse informant, given the abundant opportunities and incentives to fabricate confession stories and the fact that jailhouse informants sometimes do in fact testify falsely, which results in wrongful convictions. But that is precisely how the trial court instructed the jury, and we must assume that the jury followed the court's instructions.[34] See, e.g., *State* v.

---

[33] For this reason, among others, we are not persuaded by Justice Palmer's attempt to distinguish *United States* v. *Noze*, supra, 255 F. Supp. 3d 352.

[34] The court instructed the jury as follows: "In weighing the testimony of an accomplice who is a self-confessed criminal, you should consider that fact. It may be that you would not believe a person who has committed a crime as readily as you would believe a person of good character.

"In weighing the testimony of an accomplice who has not yet been sentenced or whose case has not yet been disposed of or who has not been charged with offenses in which the state has evidence, you should keep in mind that he may in his own mind be looking for some favorable treatment in the sentence or disposition of his own case or hoping not to be arrested.

"Therefore, he may have such an interest in the outcome of this case that his testimony may have been colored by that fact. Therefore, you must look with particular care at the testimony of an accomplice and scrutinize it very carefully before you accept it.

"There are many offenses that are of such a character that the only persons capable of giving useful testimony are those who are themselves implicated in the crime. It is for you to decide what credibility you will give to a witness who has admitted his involvement in criminal wrongdoing; whether you will believe or disbelieve the testimony of a person who by his own admission has committed or contributed to the crime charged by the state here. Like all other questions of credibility, this is a question you must decide based on all the evidence presented to you.

State *v.* Leniart

*Booth*, 250 Conn. 611, 626, 737 A.2d 404 (1999), cert.
denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060,
120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). In addition,
although jurors may have entered the courtroom igno-
rant of some of this information, the problems that
Natapoff described are readily understood and easily
probed on cross-examination. For example, Douton
conceded on cross-examination that he had followed
the victim's case in the New London Day newspaper
while incarcerated, that he had looked at the defen-
dant's legal papers when they were in a holding cell
together, and that, in exchange for his testimony, he
hoped that the state would agree to modify his sen-
tences to run concurrently rather than consecutively.
Indeed, the prosecutor himself acknowledged to the
jury in closing argument that "[a]ll these [prisoners] are
hoping for consideration or most of them are hoping
for consideration . . . ." Defense counsel also ques-
tioned the state's other witnesses on multiple occasions
about any opportunities they may have had to read the
defendant's legal papers or to collaborate. In short, it

"Witnesses testified in this case as informants. An informant is someone
who has information regarding the crime and agrees to testify in exchange
for some benefit from the state. In evaluating an informant's testimony, you
should consider the benefits that the state has promised the informant in
exchange for his cooperation.

"It may be that you would not believe a person who is receiving benefits
in exchange for testimony as well as you might believe other witnesses. An
informant may have such an interest in the outcome of this case that his
testimony may have been colored by that fact.

"Therefore, you must look with particular care at the testimony of an
informant and scrutinize it very carefully before you accept it. You should
determine the credibility of that witness in the light of any motive for
testifying falsely and inculpating the accused.

"If you find that the witness is an informant who has been promised a
reduction in his sentence or other valuable consideration by the state in
return for his testimony or who hopes for or expects consideration by the
state in return for his testimony, you must decide whether you will believe
or disbelieve the testimony of a person who is testifying in exchange for
some benefit from the state. Like all other questions of credibility, this is
a question you must decide based on all the evidence presented to you."

State *v.* Leniart

was not unreasonable of the trial court to conclude that, through common sense, the information presented at trial, and the court's instructions, the jurors would have already been familiar with any concepts presented in Natapoff's testimony that were directly and specifically applicable to this case.

Third, agreeing with the Appellate Court that expert testimony such as Natapoff's *must* be admitted in any case in which it is relevant—presumably any case in which the testimony of an informant plays more than a minimal role—would set a costly and troubling precedent. As one court has recognized, if defendants are allowed to put on experts who will testify as to the questionable credibility of criminal informants, then, surely, the state will want to parry with experts of its own. These counter experts would, undoubtedly, tell the jury about the critical and generally reliable role that informants play in many criminal prosecutions. *United States* v. *Noze*, supra, 255 F. Supp. 3d 355. Criminal trials would devolve into expensive and time consuming "battles of [road show] experts . . . ." Id.

For these and other reasons, although Natapoff has been permitted to testify in one civil trial subsequent to the defendant's conviction; see *Larson* v. *State*, 194 Wn. App. 722, 731 n.5, 375 P.3d 1096, review denied, 186 Wn. 2d 1025, 385 P.3d 117 (2016); other courts generally have not permitted Natapoff or other experts to testify regarding the credibility of criminal informants. See *People* v. *Curl*, 46 Cal. 4th 339, 360, 207 P.3d 2, 93 Cal. Rptr. 3d 537 (2009) (trial court did not abuse discretion in precluding expert testimony on methods used by jailhouse informants to fabricate testimony), cert. denied, 559 U.S. 1009, 130 S. Ct. 1881, 176 L. Ed. 2d 369 (2010); *People* v. *Vega*, Docket No. G045613, 2013 WL 1736669, *8 (Cal. App. April 23, 2013) (Natapoff's testimony was properly excluded), review denied, California Supreme Court, Docket No. S210465 (June 26,

State *v.* Leniart

2013); *State* v. *Woods*, supra, 2014 WL 4437733, *7 (trial court did not abuse its discretion by excluding expert testimony when informant was cross-examined at length); see also *Servello* v. *Commissioner of Correction*, 95 Conn. App. 753, 763, 899 A.2d 636 (upholding habeas court's conclusion that expert testimony would not have assisted jury), cert. denied, 280 Conn. 904, 907 A.2d 91 (2006).

By contrast, in other instances in which we have allowed or required expert testimony as to the reliability of a class of witnesses, we relied on the fact that sister states routinely admit such evidence. See, e.g., *State* v. *Guilbert*, supra, 306 Conn. 233–39 and n.20 (eye witness testimony); *State* v. *Ali*, supra, 233 Conn. 434 (reporting delays by rape victims); *State* v. *Borrelli*, supra, 227 Conn. 170 (battered woman's syndrome); *State* v. *Spigarolo*, supra, 210 Conn. 377 (disclosure tendencies of sexually abused children). Accordingly, we are unable to say that the trial court abused its discretion in concluding that Natapoff would not have provided any expert information that was both directly applicable to the case at hand and beyond the ken of the average juror.[35]

The judgment of the Appellate Court is reversed with respect to the evidentiary claims at issue in the state's certified appeal and the case is remanded to that court with direction to consider the defendant's remaining claims on appeal; the judgment is affirmed in all other respects.

In this opinion ROBINSON, KAHN and VERTE-FEUILLE, Js., concurred.

[35] Because the Appellate Court reversed the defendant's conviction on evidentiary grounds, it did not consider various constitutional challenges that he raised. *State* v. *Leniart*, supra, 166 Conn. App. 182 n.28, 212 n.39. On remand, the Appellate Court will have the opportunity to consider those claims in the first instance.

State *v.* Leniart

KAHN, J., concurring. I agree with and join the majority opinion, in which the judgment of the Appellate Court is reversed with respect to the state's appeal and affirmed with respect to the cross appeal of the defendant, George Michael Leniart. That is, I agree with part I of the majority opinion that the Appellate Court properly concluded that the evidence was sufficient to sustain the defendant's conviction. See *State* v. *Leniart*, 166 Conn. App. 142, 150, 140 A.3d 1026 (2016). I also agree with part III of the majority opinion that the Appellate Court improperly concluded that the trial court abused its discretion when it precluded expert testimony proffered by the defendant regarding the reliability of jailhouse informant testimony. See id., 212. Finally, I agree with part II of the majority opinion that the trial court read this court's decision in *State* v. *Porter*, 241 Conn. 57, 93–94, 698 A.2d 739 (1997), cert. denied sub nom. *Porter* v. *Connecticut*, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), too broadly, to require the per se exclusion of the videotaped interview of Patrick J. Allain (interview), conducted prior to his polygraph test, but that any error as to this evidentiary ruling was harmless. Our holding in *Porter* was confined solely to the results of the polygraph test and the willingness of the witness to submit to that test— evidence of either is per se inadmissible. See id., 93. As a result of its overly broad reading of *Porter*, the trial court improperly failed to exercise its discretion to determine whether the interview evidence, given the facts and circumstances presented, would have been more probative than prejudicial.

I write separately solely to emphasize that, because the interview was conducted in conjunction with a pending polygraph test, the inclusion of any portions of the interview that disclose that fact would be inadmissible under *Porter* to the extent that such evidence would make clear that Allain had agreed to submit to

State *v.* Leniart

a polygraph test. Further, I agree with the state that any reference to the fact that the interview took place in the context of a polygraph test may lead the jury to improperly speculate as to the results of that test. In the present case, the jury's speculation would have run, if anything, against the defendant. As the state conceded at oral argument before this court, from the fact that Allain submitted to a polygraph test and the state then chose to call him as a witness, the jury reasonably could have inferred that Allain passed that test. That inference would have bolstered Allain's credibility, rather than undermining it.

The substance of some of the comments of the polygraph examiner, Trooper Tim Madden of the Connecticut State Police, during the interview would have increased the likelihood that the jury would infer from the videotape that Allain had passed the polygraph test. For example, Madden explained to Allain that, although he did not care whether Allain was truthful during the polygraph test, the prosecution team, "want[s] you to pass this polygraph. They want to get you to be identified as a reliable witness." Put another way, he explained to Allain that, "if you fail this, what happens is, it gets to a point where you now become a less reliable witness . . . ." Madden framed the issue in terms of how useful Allain would be to the state as a witness. If Allain told the truth and passed the polygraph test, then "we can use [you] as a witness as opposed to an accused, alright? It works to our benefit because we have a good, solid, confirmed, reliable witness, alright?"

Throughout the interview, Madden emphasized the importance of passing the test. For example, he stated to Allain that, if he failed, "then you're no longer useful. Gotta come out with all of it, and you gotta pass. Then you're very useful. Then we can say, hey look, this is a cooperating witness. He has a lot of value to us. That's

State *v.* Leniart

why it's imperative that it all comes out and you pass the polygraph. Alright. You understand what I'm saying?''

The excerpted portions of the interview demonstrate that the jury could infer from Madden's statements that the state would use Allain as a witness only if he passed the polygraph test. It would not require a Holmesian leap for the jury to further infer from the fact that the state called Allain as a witness that he had indeed passed the polygraph test.

This would be particularly detrimental to the defendant's case because it is at least arguable that Allain failed the polygraph test. See *State* v. *Leniart*, supra, 166 Conn. App. 185 (''The defendant contends, on the basis of a report disclosed to the defense by the state, that Allain failed the polygraph examination. Although the state conceded that the report contained a preliminary conclusion that some of Allain's answers were consistent with deception, the state argued that it would have had to conduct additional testing to determine whether Allain actually failed the polygraph test. There is no evidence that the state performed such testing despite the officers' representations to Allain that the test would definitively determine if he was telling the truth, and thus he must take and pass it before he would be permitted to testify and become eligible for favorable treatment in connection with [the victim's] rape, disappearance, and death.'') The trial court's proper exercise of its discretion would prevent this eventuality. Although there are multiple references to the polygraph during the interview, there are sections of it that do not refer to the impending test. Had the court exercised its discretion, it would have examined the entire videotape to determine whether all or part of the interview would disclose that the questions and answers were in the context of a polygraph test. Having done so, the court could consider whether the videotape could be redacted to remove any such references to the poly-

State *v.* Leniart

graph. Another option the court properly could have considered in the exercise of its discretion would have been to admit only the portions of the interview that the defendant claimed were useful and did not disclose that the interview was in the context of a polygraph test.

Finally, I note my agreement with the majority opinion, for all the reasons stated therein, that the error was harmless.

PALMER, J., with whom McDONALD, J., joins, concurring in part and dissenting in part. I agree with and join parts I and II A of the majority opinion. For the reasons enumerated by Justice D'Auria in his concurring and dissenting opinion, I disagree with part II B of the majority opinion and conclude that the trial court's erroneous exclusion of the video recording of Patrick J. Allain's polygraph pretest interview was not harmless error. I also disagree with part III of the majority opinion because I believe that the defendant, George Michael Leniart, was entitled to introduce the expert testimony of Alexandra Natapoff, a law professor, regarding the questionable credibility of incarcerated informants and the risk of relying on them as witnesses in criminal prosecutions.

I reach the conclusion regarding the proffered testimony of Natapoff—whose expertise on the use of jailhouse informants has not been challenged by the state—for essentially the same reasons that are set forth in the opinion of the Appellate Court. See *State* v. *Leniart*, 166 Conn. App. 142, 212–28, 140 A.3d 1026 (2016). In particular, I agree with the Appellate Court that, contrary to the determination of the trial court, Natapoff's testimony would not have invaded the exclusive province of the jury to assess the credibility of witnesses; id., 221–24; and the subject matter of her testimony was not within the ken of the average juror. Id., 224–27. I also agree with the Appellate Court that the

State *v.* Leniart

trial court's general instruction cautioning the jury about the reliability of jailhouse informant testimony, given in accordance with this court's mandate in *State* v. *Arroyo*, 292 Conn. 558, 569–71, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010), was an inadequate substitute for Natapoff's testimony. See *State* v. *Leniart*, supra, 227.

With respect to the issue of whether Natapoff's testimony would have constituted an improper usurpation of the jury's role as the sole judge of witness credibility, the Appellate Court aptly explained that, ''[a]s long as [an] expert does not directly opine about a particular witness' credibility or . . . testify in such a way as to vouch indirectly for or bolster the credibility of a witness, the expert's testimony would not invade the province of the jury to decide credibility and may be admitted.'' Id., 223. As the Appellate Court further explained, there was nothing in Natapoff's testimony that ''cross[ed] the line into impermissible expert testimony regarding credibility. Natapoff, in fact, offered no testimony regarding any of the particular informants in this case, either with respect to their status as informants, how they had obtained their information, or their potential reliability as witnesses. The defense clearly indicated to the court during argument that the defendant did not intend to ask Natapoff about the present case and that Natapoff had no specific knowledge of the case or the informants involved. [Rather] Natapoff's testimony, as proffered, was narrowly tailored to provide only general information related to informant testimony and its unreliability . . . and could have aided the jury in making its own informed and independent assessment regarding the credibility of informants in the present case.'' (Citation omitted.) Id., 223–24. Consequently, there was no reason to believe that Natapoff's testimony would have intruded into the jury's

State *v.* Leniart

exclusive domain of determining the credibility of the state's jailhouse informant witnesses.

With regard to whether the information about jailhouse informants that the defendant sought to present through Natapoff's testimony was known to the average juror, the Appellate Court first observed that Natapoff testified outside the presence of the jury about "the inherent problems associated with the use of jailhouse informants. According to Natapoff, the manner in which informants are used in the criminal justice system is largely unregulated and secretive, and the public has very little knowledge about the process. She testified that jailhouse informants are known to fabricate information because they are aware that they can barter with the state for favorable treatment on the basis of such information.

"In particular, Natapoff stated: 'We have evidence of collusion between jailhouse informants in which informants cooperate in order to create stories that they corroborate in order to persuade the government to use that information. We know that sometimes informants and criminal offenders can be very entrepreneurial about coming up with information, knowing that the system will likely reward them in some way.' The hope for favorable treatment also provides a strong incentive for informants to search out any source of information, reliable or not, so that they can trade that information to the authorities.

"Natapoff also testified about studies that demonstrate that the usual cautionary instructions given to jurors about informant testimony generally are not effective and that even if jurors are made aware of and cautioned about an informant's compensation or other motivation to fabricate testimony, jurors are ill-equipped to accurately evaluate an informant's credibility and often will accept the testimony as true. One

State *v.* Leniart

study published by Northwestern Law School, discussed by Natapoff during her testimony, indicated that approximately 45 percent of all the wrongful capital convictions identified in this country were the direct result of an informant who was lying. According to Natapoff, informants' stories are often difficult to corroborate or to contradict, especially in cases in which the informant's testimony is the central evidence against the defendant.'' Id., 215–16.

In addition, when the prosecutor questioned Natapoff on cross-examination why an average juror likely would not have sufficient knowledge about the inherent unreliability of jailhouse informants based on common sense alone, Natapoff stated: ''I think that a lay person on a jury cannot know the extent of the benefits and expectations that an informant in our system would reasonably expect to get; that a promise or an understanding made by a police officer or prosecutor to an informant . . . and the history of the use of informants in our jails and prisons give informants and law enforcement knowledge about benefits that a lay person couldn't understand and wouldn't see from the outside. . . . I think a lay person would not expect or could not be expected to understand how much effort informants sometimes put into coming up with information from stealing files from other inmates to calling outside sources and asking for resources from the newspapers and media from outside sources. They couldn't be expected to understand the culture in jails; the understanding that this entrepreneurial approach to information is expected. A lay person on a jury could not be expected to know how infrequent perjury prosecutions are for informants who turn out to be lying. In polling jurors after trials or after cases [in which] a wrongful conviction is found, you sometimes hear jurors say that they think that if an informant lies, [he or she will] be prosecuted for perjury but because that is so rare, that expectation is

State *v.* Leniart

misguided, although it's a widely shared expectation, I think, among the public.'' (Internal quotation marks omitted.) Id., 216–17.

In light of Natapoff's unchallenged testimony and the state's failure to present any contrary evidence or information, by way of empirical studies or otherwise, demonstrating that average jurors are sufficiently knowledgeable about the use and unreliability of jail-house informants so as to render expert testimony on the subject unnecessary, the Appellate Court concluded that the trial court had abused its discretion in preclud-ing Natapoff from testifying. Id., 220–21. I agree with this conclusion and with the Appellate Court's reasons for reaching it. As that court explained, although aver-age jurors may have some limited knowledge about the use of jailhouse informants, we cannot presume that they are aware either of the prison culture in which such testimony is spawned or the full extent to which such informants are likely to benefit as a result of their testimony. Id., 224. Jurors also are unlikely to be aware of the efforts undertaken by jailhouse informants to obtain their information and of the various sources of that information. Id. Furthermore, jurors often believe that a jailhouse informant who lies will face perjury charges when, in fact, such charges are almost never brought. Id., 225. Thus, even with an instruction cau-tioning jurors to take great care in evaluating the credi-bility of jailhouse informants, jurors are ill-equipped to do so because they simply are unaware of the true dangers in relying on such testimony.[1] Id. Finally, jail-

---

[1] We previously have stated that "the trial court should instruct the jury that the [jailhouse] informant's testimony must be reviewed with particular scrutiny and weighed . . . with greater care than the testimony of an ordi-nary witness. . . . In addition, the trial court may ask the jury to consider: the extent to which the informant's testimony is confirmed by other evidence; the specificity of the testimony; the extent to which the testimony contains details known only by the perpetrator; the extent to which the details of the testimony could be obtained from a source other than the defendant; the informant's criminal record; any benefits received in exchange for the

State *v.* Leniart

house informants played a significant role in the state's case against the defendant; id., 221; a fact that underscores the importance of Natapoff's testimony.

It bears emphasis that both this court and the legislature have recognized the unique problems attendant to the state's use of jailhouse informant testimony. One decade ago, in *State* v. *Arroyo*, supra, 292 Conn. 558, we expressly recognized the need to educate jurors on the inherent unreliability of jailhouse informant testimony. In coming to that conclusion, we explained that, "[i]n recent years, there have been a number of high profile cases involving wrongful convictions based on the false testimony of jailhouse informants. . . . Several of these cases resulted in formal investigations that shed much needed light on the extensive use of jailhouse informants in criminal prosecutions, an issue that previously had been largely a closeted aspect of the criminal justice system. . . . One such investigation . . . revealed an appalling number of instances of perjury or other falsifications to law enforcement . . . . The [investigation] also [revealed] that a particularly clever informant realizes that a successful performance on the witness stand is enhanced if it appears he or she is not benefiting from the testimony. . . . These informants wait until after [they have] testified

testimony; whether the informant previously has provided reliable or unreliable information; and the circumstances under which the informant initially provided the information to the police or the prosecutor, including whether the informant was responding to leading questions." (Citations omitted; internal quotation marks omitted.) *State* v. *Arroyo*, supra, 292 Conn. 570–71. In the present case, the trial court complied with *Arroyo* by instructing the jury that "[a]n informant may have such an interest in the outcome of this case that his testimony may have been colored by that fact," that the jury "should consider the benefits that the state has promised the informant in exchange for his cooperation," and that it "must look with particular care at the [informant's] testimony . . . and scrutinize it very carefully before you accept it." It is noteworthy, however, that the trial court did not instruct the jury on any of the other considerations concerning the credibility of jailhouse informant testimony that we identified in *Arroyo*.

State *v.* Leniart

to request favors—a request that is generally answered. . . . And, because the reward is not offered before the testimony, the jury has no way to measure the informant's motivation to fabricate testimony, as the prosecutor . . . is under no obligation to disclose nonexisting exculpatory evidence. . . . Thus, the expec-tation of a [r]eward for testifying is a systemic reality . . . even [when] the informant has not received an explicit promise of a reward. In addition, several commentators have pointed out that jailhouse informants frequently have motives to testify falsely that may have nothing to do with the expectation of receiving benefits from the government.''[2] (Citations omitted; footnotes omitted; internal quotation marks omitted.) Id., 567–69. Thus, inmates have various incentives to fabricate confessions by other inmates or otherwise to testify falsely, incentives with which jurors are not likely to be familiar.

Insofar as the informal and largely undisclosed nature of the relationship between a typical jailhouse informant and the state is concerned, this court, in *Marquez* v. *Commissioner of Correction*, 330 Conn. 575, 198 A.3d 562 (2019), recently explored the subject of cooperating witnesses generally, and what we found was troubling, to say the least.[3] In particular, we addressed and

_____

[2] In regard to this particular aspect of jailhouse informant testimony, in *Arroyo*, we quoted the findings and observations of several commentators, who explained, among other things, that jailhouse informants often believe that they have nothing to lose and everything to gain by testifying for the state because they are already incarcerated, incentives that may seem trivial to the average person may serve as an "invitation to [commit] perjury" to someone who is imprisoned, and such informants may be motivated by "emotional impetuses" such as "the thrill of playing detective, fear, and survival . . . ." (Internal quotation marks omitted.) *State* v. *Arroyo*, supra, 292 Conn. 569 n.10.

[3] *Marquez* was a habeas case involving the relationship between the state and the petitioner's accomplice, who had testified for the state at the petitioner's underlying criminal trial. See *Marquez* v. *Commissioner of Correction*, supra, 330 Conn. 577. Everything we explained in *Marquez*, however, about the nature of the relationship between the state and its cooperating witnesses generally applies equally, if not with greater force, to the relationship between the state and jailhouse informants. See id., 603–605.

State *v.* Leniart

expressed concern over what we characterized as the
''state's practice of informal, off-the-record leniency
understandings with cooperating witnesses.'' Id., 603.
We explained this practice and the serious hazards asso-
ciated with it: ''These [informal, off-the-record leniency]
understandings . . . often involve a prosecutor's
suggesting—although not promising—that a favorable
recommendation to the sentencing judge and/or a
reduction in the charges against the witness might be
forthcoming in exchange for the witness' testimony
inculpating another defendant. . . . Often such repre-
sentations are made only to the witness' counsel, while
the prosecutor's communication with the witness
makes clear that there is no promise. Under such cir-
cumstances, the prosecutor may not actually know if
any representations of possible leniency have been con-
veyed by the witness' counsel to the witness. Thereafter,
if, before the jury, the witness denies that there is any
actual 'agreement' or 'deal,' the prosecutor can accu-
rately state . . . that he does not have a reason to know
if the witness is being untruthful. Although it might very
well be accurate that no definitive promises have been
made by the state, and, even if any possible outcomes as
described to counsel might be 'tentative,' experienced
counsel operating in a courthouse in which he or she is
familiar with the practices of prosecutors and presiding
judges can comfortably advise the witness of the possi-
ble credit that might follow from his testimony. Thus,
these 'hypothetical' outcomes serve as a real incentive
to motivate a witness to testify for the state.

''Left out of this equation, however, is the jury. . . .
These vague understandings can prevent defense coun-
sel from effectively impeaching the witness for bias,
perhaps leaving jurors with the impression . . . that
[the witness did not have] any incentive to testify favor-
ably for the state. . . . Jurors are not well versed in
the nuanced vagaries of such leniency agreements. Yet,

State *v.* Leniart

we rely on jurors to assess a witness' credibility— including a witness' motivation to testify—while withholding from them critical information that would help them assess just how motivated that witness might be. This practice, therefore, carries with it risks that threaten the efficient and fair administration of justice.''[4] (Citations omitted.) Id., 603–605.

Although we indicated in *Marquez* that the state can avoid the obvious problems attendant to this practice by, inter alia, memorializing more clearly the nature of any agreement or understanding it has with the cooperating witness, we candidly acknowledged that "the absence of an express agreement may require a defendant to explore other means to reveal to the jury a cooperating witness' motivation to testify.'' Id., 606. We then stated: "For example, in an attempt to inform the jury about a system in which promises are not explicitly made but understandings are drawn from pretrial discussions, defendants might resort to calling expert witnesses to attempt to explain to the jury just how much leniency a cooperating witness can expect from his testimony.'' Id. That is precisely the kind of testimony that Natapoff was qualified to offer in the present case.

The problems inherent in the state's use of jailhouse informant testimony have become so acute that the legislature has seen fit to weigh in on the issue during its most recent legislative session. See Public Acts 2019, No. 19-131 (P.A. 19-131). That legislation, among other

---

[4] Indeed, those risks were manifest in *Marquez*. At trial, the cooperating accomplice, who was charged with felony murder and faced a mandatory minimum prison term of twenty-five years for that offense, testified that he expected no leniency or other consideration in exchange for his testimony, and that he was cooperating with the state solely because it was "the right thing to do.'' (Internal quotation marks omitted.) *Marquez* v. *Commissioner of Correction*, supra, 330 Conn. 581–82. Yet, "[n]otably, after [the accomplice] testified [for the state] the prosecution chose not to pursue the felony murder charge originally brought against him. Instead, he was sentenced to [an effective] term of [imprisonment of nine years] . . . for . . . robbery . . . and attempt to commit robbery . . . .'' Id., 588.

State *v.* Leniart

things, requires that prosecutors who intend to intro-
duce the testimony of a jailhouse witness disclose
certain information to defense counsel, including the
complete criminal history of the jailhouse witness, any
pending charges, any cooperation agreement between
the state and the witness, any benefits offered or pro-
vided by the state to the witness, the substance, time
and place of any statement allegedly given by the defen-
dant to the witness, the substance, time and place of
any statement given by the witness implicating the
defendant in the charged offense, whether, at any time,
the witness recanted any testimony subject to disclo-
sure, and information concerning any other criminal
prosecution in which the jailhouse witness previously
testified or offered to testify. See P.A. 19-131, § 1. In
addition, the legislation establishes a statewide system
for recording and tracking information on the use of
jailhouse witnesses. See P.A. 19-131, § 3.

Finally, and perhaps most significantly, under P.A.
19-131, in cases involving murder, murder with special
circumstances, felony murder, arson murder, sexual
assault in the first degree, aggravated sexual assault in
the first degree, and aggravated sexual assault of a
minor, and, upon motion of the defendant, the trial court
must conduct a hearing to decide whether a jailhouse
witness' testimony is sufficiently reliable to be admissi-
ble. See P.A. 19-131, § 2. The legislation further provides
that, unless the prosecutor can establish by a prepon-
derance of the evidence that the witness' testimony is
reliable, the court shall not allow the testimony to be
admitted. See P.A. 19-131, § 2. Finally, in making its
determination concerning the reliability of the witness'
testimony, the court is required to consider the factors
enumerated in P.A. 19-131, § 1, as well as the following
factors: ''(1) [t]he extent to which the jailhouse [wit-
ness'] testimony is confirmed by other evidence; (2)
[t]he specificity of the testimony; (3) [t]he extent to

State *v.* Leniart

which the testimony contains details known only by
the perpetrator of the alleged offense; (4) [t]he extent
to which the details of the testimony could be obtained
from a source other than the defendant; and (5) [t]he
circumstances under which the jailhouse witness ini-
tially provided information supporting such testimony
to [the police] or a prosecutorial official, including
whether the jailhouse witness was responding to a lead-
ing question.'' P.A. 19-131, § 2.

This legislation is truly extraordinary, especially inso-
far as it requires the court to screen jailhouse informant
testimony for threshold reliability and renders the testi-
mony inadmissible unless the state can affirmatively
demonstrate the reliability of the testimony. Ordinarily,
any probative testimony is admissible unless the court
finds the witness to be incompetent by virtue of age,
infirmity, mental incapacity or the like; the opportunity
for confrontation and cross-examination is invariably
considered to be a sufficient protection against false
or misleading testimony. In creating the rarest of excep-
tions to this bedrock evidentiary principle for the tes-
timony of jailhouse informants, the legislature has man-
ifested its deep concern about the highly problematic
manner in which such testimony is used by the state.
The same considerations that prompted the legislature
to act convince me that the defendant was entitled to
the benefit of Natapoff's expert testimony on the subject
of jailhouse informant testimony.

I note, finally, that the majority identifies a few cases
to support its conclusion that the defendant was not
entitled to the benefit of Natapoff's expert testimony
on the dangers inherent in the state's use of jailhouse
informants. The majority places particular reliance,
however, on *United States* v. *Noze*, 255 F. Supp. 3d 352
(D. Conn. 2017), aff'd sub nom. *United States* v. *Dugue*,
763 Fed. Appx. 93 (2d Cir. 2019), in which the United
States District Court rejected the request of the defen-

State *v.* Leniart

dants in that case to adduce expert testimony concerning the government's use of "two so-called 'cooperating witnesses,' i.e., alleged [coconspirators] of the defendants who have pleaded guilty and who are 'cooperating' with the [g]overnment by testifying at trial in hopes of receiving a sentence reduction." Id., 353. I respectfully disagree that *Noze* represents persuasive precedent for the majority's holding in the present case, primarily because *Noze* simply did not involve the prosecution's use of testimony from a *jailhouse informant*; at issue, rather, was the admission of testimony from cooperating coconspirators of the defendants in that case. The difference between the government's use of cooperating coconspirator testimony in *Noze* and the state's use of jailhouse informant testimony in the present case is as critical as it is evident: as I previously discussed, the testimony of jailhouse informants is readily fabricated and otherwise particularly suspect for a number of reasons not generally apparent to jurors. The same cannot be said of other, more traditional cooperating witnesses who, like the government's witnesses in *Noze*, have not come forward as part of a prison culture that is largely hidden from public view and whose testimony is not so easily concocted.

For the foregoing reasons, I dissent from part III of the majority opinion in which the majority determines that the Appellate Court incorrectly concluded that the trial court had abused its discretion in precluding the defendant from adducing Natapoff's expert testimony on jailhouse informants. For the reasons set forth by Justice D'Auria, I also dissent from part II B of the majority opinion, in which the majority concludes that the trial court's erroneous exclusion of the video recording of Allain's polygraph pretest interview was harmless. Because I agree with and join parts I and II A of the majority opinion concerning the corpus delicti rule and the propriety of the trial court's exclusion of

State *v.* Leniart

the video recording of Allain's interview, respectively, I respectfully concur in part and dissent in part.

D'AURIA, J., concurring in part and dissenting in part. I agree fully with part I of the majority's cogent and thorough opinion. Specifically, I agree that the defendant's corpus delicti claim is reviewable; that the corpus delicti rule is a substantive rule of criminal law and not a purely evidentiary rule of admissibility; and that there was sufficient evidence to sustain the defendant's conviction.

I also agree with part II A of the majority's opinion, and with the Appellate Court, that the trial court erroneously ruled that the videotape of Patrick J. Allain's polygraph pretest interview with the police was inadmissible. I disagree, however, with part II B of the majority's opinion, which concludes that the trial court's error was harmless. Rather, for substantially the same reasons detailed by the Appellate Court in its persuasive opinion on this issue; see *State* v. *Leniart*, 166 Conn. App. 142, 194–97, 140 A.3d 1026 (2016); I conclude that the defendant has met his burden of demonstrating the harmfulness of the trial court's error. I therefore respectfully dissent from the majority's decision reversing in part the judgment of the Appellate Court, on the ground that the exclusion of the pretest videotape was harmless, and would instead affirm the Appellate Court's judgment ordering a new trial.[1]

_____

[1] Because I agree with the Appellate Court that the trial court's error should result in a new trial, it is not necessary for me to reach the expert witness issue addressed in part III of the majority's opinion. However, because the majority has reached the issue and because the issue would likely arise at a new trial if one were to be ordered; see Practice Book § 63-4 (a) (1) (B); I express my agreement with the majority's conclusion that the defendant has not demonstrated that the trial court abused its discretion in excluding the proffered expert testimony. I therefore join part III of the majority's opinion.

State *v.* Leniart

The majority finds the question of harm in this case to be a ''close call,'' but ultimately concludes that the defendant has not demonstrated that exclusion of the videotape substantially affected the verdict. My own review of the videotape of Allain's pretest interview, when measured against the cross-examination of Allain that defense counsel was both able to undertake and prevented from undertaking without the benefit of that interview, leads me to a contrary conclusion. Given the importance of Allain as a witness, and given the defense the defendant sought to mount, I am not left with ''a fair assurance that the error did not substantially affect the verdict.'' (Internal quotation marks omitted.) *State* v. *Rodriguez*, 311 Conn. 80, 89, 83 A.3d 595 (2014).

The state admitted that Allain was a ''crucial'' witness for its case. He was the only witness who was with the defendant and the victim on the night of her disappearance. Indeed, Allain understood—and was concerned—that the police might conclude that *he* had murdered the victim. Over the years, Allain had made a number of statements incriminating himself, including asking his father to help him move the victim's body from its burial spot. In fact, there was sufficient ''direct evidence'' that Allain might have committed the murder that the defendant sought—and the trial court gave—a third-party culpability charge to the jury. See *State* v. *Schovanec*, 326 Conn. 310, 319, 163 A.3d 581 (2017).

The defendant's cross-examination of Allain did not simply attack the truthfulness of his testimony, the clarity of his memory of the events of that night or his own potential culpability. Rather, the defendant sought to develop a specific theme of bias: that Allain had increasingly tailored his statements over the years—and on the witness stand continued to tailor his testimony—to what authorities wanted to hear by implicating the defendant. Allain was motivated to do this, the defendant contended, either to deflect attention away from himself as a suspect in the murder, or to secure more

State *v.* Leniart

favorable treatment for himself, both as a participant in the victim's disappearance and in other cases for which he had received or continued to face significant sentences.[2]

In response to the defendant's argument that the trial court's error harmed him, both the state and the majority argue that the defendant had ample opportunity to cross-examine Allain and impeach his direct testimony. And, in fact, as the majority details, the record of Allain's cross-examination reveals that defense counsel was able to make some inroads in developing a theme of bias.

Specifically, Allain admitted that beginning in 1997, and up until the time of trial in 2010, he had met with the state police "around twenty-five" times. Only one of those meetings was videotaped: the 2004 polygraph pretest interview at issue in this case. Allain had also given the police three separate and somewhat varying written statements, in 1997, 2004 and 2007.[3] Part of the defendant's theme was not only that Allain had left out significant details in each of those statements such that he should not be believed, but that with each statement—and ultimately in his trial testimony—he included significant details that increasingly implicated the defendant, especially as the defendant began to understand that the police were looking harder at him as a suspect.

[2] As the Appellate Court noted, at the outset of the pretest interview in 2004, Allain "repeatedly made clear that he was motivated to take the test because he recently had been charged with violating his probation and had a suspended period of incarceration hanging over his head," and "his probation officer was 'pushing toward violating me if I don't take' " the polygraph test. *State* v. *Leniart*, supra, 166 Conn. App. 183. By the time he testified at the defendant's trial in 2010, Allain had served nearly two and one-half years of a ten year sentence for sexual assault in the second degree. Allain was never charged at all in relation to the victim's disappearance in the present case.

[3] There is some confusion about the date of one of the statements. It appears to be dated 2001, but it could have been 2007.

State *v.* Leniart

Although the jury certainly had the opportunity to assess Allain's demeanor in the context of the trial as he faced aggressive cross-examination on these issues, the videotape was the only actual display of Allain's exchanges with the police, evidence of what the Appellate Court aptly described as "subtle but significant pressure" by the police[4] "to shape Allain's story" in a way that allowed them to get the " 'big fish' " (i.e., the defendant). *State* v. *Leniart*, supra, 166 Conn. App. 195– 96. It would, of course, have been for the jury to determine whether it agreed with these characterizations of Allain's interactions with the police. It would also have been for the jury to infer, if it chose to do so, that the police had perhaps exerted similar pressure on Allain to shape the statements he had given them over the years (1997, 2004 and 2007), resulting in his trial testimony, during which he continued to add details he had neither included in any previous written statement nor disclosed to state police Trooper Tim Madden at the pretest interview.

The exclusion of the pretest interview not only prevented the defendant from showing to the jury Allain's interaction with the police for the jury's own assessment, but deprived the defendant of a significant check

[4] The videotape shows not just the interview with state police Trooper Tim Madden, but a brief exchange with two other police officers. This exchange at least arguably could have been construed to suggest not so "subtle pressure." When asked by Madden if he was taking the polygraph voluntarily, Allain referred to the fact that he was facing a violation of probation charge and understood from the other officers that he likely would be returned to jail for as much as five years for violating his probation if he did not take the polygraph test. Madden sought to disabuse Allain of this notion himself and also brought the other officers into the room in the middle of the pretest interview to assure him that that would not happen. Madden further admonished Allain that he would not administer the polygraph test unless he was submitting to it voluntarily. Shortly after talking to the other officers, Allain indeed backed off and said he was taking the polygraph to "tell the truth" and "do the right thing," not because of any threat to be returned to jail, as he had indicated at the beginning of the interview. Apparently satisfied, Madden pressed forward with the interview. This would have been an important set of exchanges for the jury to evaluate.

on Allain's trial testimony. On several occasions, the defendant was unable effectively to examine Allain (who was accompanied at the defendant's trial by state appointed counsel) about what the police had said to him or he had said to them at the pretest interview because he answered that he could not recall. At one point, defense counsel asked the defendant if it would refresh his recollection if he viewed the videotape. The state objected, and the trial court sustained the objection. Thus, to the extent the state suggests in its reply brief that any error was harmless because the defendant could have kept Allain honest by impeaching him with the videotape or refreshing his recollection, this argument rings hollow. Compare id., 188 n.33. Rather, I agree with the Appellate Court that the defendant has carried his burden of demonstrating harm.[5]

Therefore, I concur in part and dissent in part.

––––––––––––––––––––––––